108 N.J. Super. 446 (1970)
261 A.2d 684
IN THE MATTER OF THE ESTATE OF LENA BAYLES, DECEASED.
Superior Court of New Jersey, Appellate Division.
Argued December 22, 1969.
Decided February 13, 1970.
*450 Before Judges SULLIVAN, CARTON and HALPERN.
Mr. Roger C. Ward argued the cause for appellants (Messrs. Pitney, Hardin & Kipp, attorneys; Mr. Gordon A. Millspaugh, Jr. on the brief).
Mr. Sam Denstman argued the cause for respondent (Messrs. Simon, Denstman & Noonan, attorneys).
The opinion of the court was delivered by CARTON, J.A.D.
The residuary legatees of the estate of Lena Bayles filed exception to plaintiff-executor's account by which they sought to surcharge him as executor for failure to dispose of her common stock in a life insurance company which comprised slightly over 60% of the total value of the assets of the estate at the time of her death. The trial court allowed the account and overruled the exception. As a result of that determination there were no assets available for distribution to these legatees, all charitable institutions. They appeal.
Decedent died April 1, 1965. Plaintiff, the attorney who drafted the will and codicil, was named executor. On April 13, 1965 he qualified as executor. He retained his firm as counsel for the estate and he himself performed most of the legal services relating to it.
The will and codicil (which contained no trusts) provided for the payment of debts and funeral expenses, and thereafter for 26 general bequests totaling $85,500, including a $5,000 gift to plaintiff personally. The residuary estate was bequeathed to the three charitable institutions in equal shares.
The will further provided for payment of taxes out of the residue, abatement of the general bequests in the event that the estate's value as of decedent's death was insufficient *451 to pay debts, satisfaction of taxes and bequests in full, and for distribution of the bequests in kind or in money, or partly in each at the discretion of the executor.
The estate consisted of assets, valued in the account as of the date of death as follows:

Shares of common stock of American
Telephone & Telegraph Company and
Public Service Electric & Gas Company $29,226.00
3,273 shares of common stock of North American
Life Insurance Company of Chicago,
valued at 29-5/8 and aggregating 96,962.25
Bonds of St. Louis-San Francisco Railroad
and Morris-Essex Railroad, having a total value of 4,635.00
Money on deposit, mostly in bank savings
accounts, and proceeds of a small insurance policy 22,630.45
Miscellaneous furniture and chattels 278.50
 ___________
 Total Gross Estate $153,732.20
 ===========

In addition, plaintiff-executor received incidental corpus items of $425.06 after decedent's death, and income in the amount of $3,415 which was transferred to corpus and used to pay corpus obligations. Plaintiff never sold any of the N.A.L. stock. Just prior to the filing of the account in February 1967 he sold the other securities at a loss of $4,783.73. Exceptions filed as to the failure to sell these securities were also overruled by the trial court, but no appeal has been taken as to that part of its ruling.
In plaintiff's account, covering the period of administration from April 1, 1965 to February 24, 1967, he sought allowance from corpus for administration and funeral expenses and claims of creditors in the amount of $18,917.45. The major items were funeral expenses $3,792.45, New Jersey transfer inheritance taxes $11,395, and federal estate taxes $2,966.59.
The account discloses that during April 1966 plaintiff distributed cash bequests in the aggregate amount of $42,750 to the general legatees. This distribution represented payment *452 of one-half of each of the individual legacies. The account also reveals that plaintiff personally advanced the sum of $14,600 between May 19, 1965 and July 5, 1966 to provide funds for the estate to pay certain obligations and to make the partial distribution just referred to. These sums advanced were later repaid by the estate to plaintiff.
At the close of the accounting period plaintiff had only the 3607 shares of N.A.L. stock (then having a market value of $12 share), along with $66.77 in cash, available to meet the balance of the general bequests, commissions, counsel fees and residuary bequests. The court, in its opinion dated August 2, 1968 approving plaintiff's account, also approved allowance to him of $5,000 of $7,910 requested commissions and $2500 of $9,000 requested attorneys' fees. The court also found that the executor was entitled to repayment of the $5200 balance remaining on his $14,600 loan to the estate. However, because the executor had already preferred himself by a $9400 repayment of that loan from the cash assets of the estate, the court directed that all monies allowed to him and his law firm should be satisfied in N.A.L. stock at its market price (then 16-7/16). As a result of the order of distribution ultimately entered, the 26 general legatees received payment in full, but there remained nothing for distribution to the residuary charitable beneficiaries.
The trial judge ruled that, notwithstanding "the tragic consequences" of the retention of the stock so far as the residuary legatees were concerned, the executor should not be surcharged because he had acted in good faith and his conduct was not such that he should be held personally liable. In arriving at this conclusion, he referred to the "history and spectacular performance of life insurance stock generally, with their ups and downs, generally out-stepping the overall economy." He reviewed the price range fluctuations of the stock between 1962 and 1965 and during the period of accounting, and commented upon the executor's awareness of the changing market and his efforts to obtain *453 information from various sources as to market price quotations and the financial condition of the company. The residuary beneficiaries challenge the court's ruling, maintaining that the executor should have sold the N.A.L. stock promptly after qualifying as executor and that, as a result of his failure to do so, they have sustained a substantial loss for which he should be surcharged. According to our estimation, had the stock been sold at or about the inventory price of $29-5/8 per share, an additional $60,000 would have been available to the estate, most of which would have been distributable to the residuary beneficiaries.
Resolution of the issue involved requires a brief statement of the pertinent legal principles. It is elementary that an executor's duties require him to reduce the decedent's personal assets to possession, to pay her debts and those of the estate, and distribute the balance to those entitled to it under the will. See In re Armour's Will, 33 N.J. 517, 524, 85 A.L.R. 2d 529 (1960); 1 Restatement, Trusts 2d, § 6(b), at 19 (1959).
The duties of an executor and trustee, although frequently interwoven, are distinct from a legal standpoint. Those of the executor are "limited to winding up the estate of the deceased and are temporary in their character." 1 Scott, Trusts (2d ed. 1956), § 6, at 56-57; 1 Restatement, Trusts 2d, supra. As the court said in In re Kohler's Estate, 348 Pa. 55, 57, 33 A. 2d 920, 921 (1943), "[t]he duty of the executor generally is not to retain and invest, but to liquidate and terminate." Unlike an executor, a trustee's "common duty * * * is not liquidation or distribution, but management." 6 N.J. Practice (Clapp, Wills and Administration), § 1021, at 564 (1962). Where there are several creditors, legatees, next-of-kin, wards, cestuis que trust, the fiduciary acting on their behalf must deal impartially with them. See In re Koretzky, 8 N.J. 506, 530 (1951); 1 Restatement, Trusts 2d, § 183, at 393 (1959).
In performing these duties which the executor assumes, he must generally act with the care and skill which a man *454 of ordinary prudence would exercise under the circumstances. See In re Koretzky, supra, 8 N.J., at 524. With respect to assets coming into his charge, the additional burden is cast upon him as fiduciary to act more cautiously than he would be required to act in the management of his own property. The following quotation from 6 N.J. Practice (Clapp, Wills and Administration), § 987, at 467 (1962), is apposite:
* * * Where the opportunity for gain more than compensates for the risk of loss, an ordinary prudent man will speculate with his property; but a fiduciary may not speculate with the property in his charge. He must in that regard act more cautiously than a man of ordinary prudence; for, unlike the ordinary man, his concern is not with increasing an estate, but with preserving the principal and providing for a regular income. Moreover, if a fiduciary, such as a corporate fiduciary, is possessed of a greater skill or more facilities than those of the ordinary prudent man, he is bound to exercise the skill he has and the facilities available to him. * * *
In the application of these general standards an executor is not ordinarily held responsible for the mere depreciation of assets, nor for a loss due to a decline in the market merely because he does not make an immediate sale even though the nature of the security mandates that a sale eventually be made. As a corollary to this proposition, however, he may be held liable for loss if he retains stock or other securities beyond a reasonable time for sale. See Peoples Nat'l Bank & Trust Co. of Pemberton v. Bichler, 115 N.J. Eq. 617, 620 (E. & A. 1934); and see Annotation, "Liability of executor or administrator for loss by depreciation in value of securities, through retaining or deferring sale thereof," 92 A.L.R. 436 (1934).
What constitutes a reasonable period of time within which securities should be disposed of, and whether an executor should be held responsible for loss as a result of the failure to sell them, therefore depends upon the circumstances of the particular case. It thus becomes necessary to examine the situation which confronted the executor *455 here to ascertain whether, in failing to sell the securities, he acted with the skill and prudence required of him under the circumstances and properly exercised the discretion vested in him by the decedent.
[The court here reviewed the background facts and reached the following conclusions:]
Considering all of the circumstances, we are satisfied that plaintiff-executor did not exercise the degree of care required of him as executor to dispose of the N.A.L. stock within a reasonable time after his qualification. The estate was a relatively simple one. It contained no trusts. Its assets were made up entirely of personal property consisting for the most part of a relatively few securities. The obligations of the estate were similarly limited in number.
The executor was an attorney experienced in handling estates. From the very inception of the assumption of his duties as executor he was fully cognizant of the fact that the stock in question comprised over three-fifths of the estate. He was mindful that the price at which it was sold would have a vital impact on the amount the residuary beneficiaries would receive. As attorney for decedent for many years during her lifetime, and because of the fact that he himself was an investor in N.A.L. stock, he was thoroughly familiar with its speculative character and the volatile changes in its market value. Its value from an income-producing standpoint was insignificant since cash dividends amounted to only slightly over 1% of its inventoried value. Although N.A.L. was not listed in any of the exchanges, a market was made for it by some 20 brokers who dealt in this stock, and bid and ask quotations appeared regularly in the Wall Street Journal. Fluctuation was not a characteristic which developed suddenly or without warning after the executor came into possession. For example, in 1961 the market price ranged between 14-7/8 and 33-3/8; in 1962 between 20-3/8 and 35-1/2, in 1963 between 28-1/4 and 35-1/4, and in 1964 between 31-1/4 *456 and 40-1/8. See Moody's Bank and Financial Manual 1641 (1965).
All of these considerations, in our estimation, mandated that the executor take reasonably prompt steps to liquidate the stock and to remove the hazard of substantial loss to the estate's beneficiaries.
The executor's explanation of his failure to sell any of the stock over a period of two years notwithstanding his familarity with its history and his appreciation of the fluctuation in its market value, suggests a misconception of the duties of an executor. True, he was interested in and made independent inquiries as to its "intrinsic value." He investigated the financial condition of the company, ascertained its progress and evaluated its possibilities of price appreciation.
It was, of course, entirely appropriate for the executor to make inquiries along these lines in order to evaluate the securities and to determine when they should be disposed of. But, as our brief review of his testimony reveals, in eliciting this information the executor's attention seems to have been focused in large measure on the market performance of the stock and oriented towards essentially investment considerations, looking to its indefinite retention rather than its disposition.
His inquiries involved considerations which were of only peripheral concern to an executor whose duties required him to liquidate and terminate with reasonable promptness. If he was satisfied that he had no immediate need for the proceeds of the sale and that the administration of the estate might continue over an extended period, prudence dictated that such securities be liquidated and the proceeds invested in a form that eliminated, as far as possible, the risk of loss to the principal. Acting as executor, he was not privileged to seek the opportunity for gain nor to accept the risk of loss inherent in the retention of speculative securities. This is so notwithstanding his confidence that this stock "would regain its high market price, just *457 as it had done in the years." That he was motivated by no personal interest and acted in good faith did not justify his taking the same risks he might have taken had the stock been his own property.
No rigid or arbitrary standard has been established as to the time during which an executor must dispose of securities of a speculative character. No duty is imposed on an executor to dispose of such securities immediately without regard to the market for them or the possibility of an advance in value. Certainly, assets ought not be hastily sacrificed any more than they should be improvidently held. Each case must rest upon its own facts. Consequently, a review of the decided cases in this and other jurisdictions would serve little useful purpose. See 92 A.L.R., supra, at 441-449 where the cases are collected.
We do not accede to the proposition now advanced by the residuary beneficiaries that the executor was obliged to sell the N.A.L. stock within 45 days of probate and that he should be surcharged on that basis. On the other hand, we do not agree that the executor had the absolute right indefinitely to postpone its disposition.
Nor does N.J.S.A. 3A:15-11 confer any such unrestricted power. It merely protects him from liability for loss by reason of the continuation, in the exercise of good faith and reasonable discretion, of investments received from the testator. The statute must be viewed in the context of an executor's primary obligations. Reasonable discretion still required him, within a reasonable time, to dispose of assets which harbored an undue risk of loss to the beneficiaries.
Nor can N.J.S.A. 3A:25-1, requiring executors or administrators "to pay and satisfy legacies" within 18 months after probate, be interpreted to relieve plaintiff of the obligation to liquidate speculative securities known to be subject to wide and frequent fluctuations. That provision establishes a period during which the executor or administrator (absent special circumstances) must take certain action *458 with respect to the legacies. In no respect is it inconsistent with his obligation to exercise reasonable care. Compare N.J.S.A. 3A:12-5, which prohibits actions against executors and administrators (absent special leave by the court) within six months after letters testamentary have been granted, and N.J.S.A. 3A:9-2, which relieves an executor or administrator, during the year following his appointment, of his duty to account, except for special cause shown.
Similarly, the executor is not entitled to be relieved of the responsibility of exercising such reasonable care simply because the will contains an authorization to distribute in kind. That duty continued as long as the assets remained in his control. In this connection, we note the executor did not, in fact, ever exercise the discretion conferred upon him to distribute in kind and the record points to the conclusion he never intended to do so. Indeed, he recognized at an early date the necessity of selling the N.A.L. stock in order to pay the amounts bequeathed to the 26 general legatees (many of which were in amounts of $500 and $1,000). That he intended ultimately to liquidate the stock also appears from his letter of May 20, 1965 to the insurance company inquiring whether there was any present market price for these shares. We note also the executor's remark that the legatees were clamoring for payment and Marguerite Bachelder's insistence that her $15,000 legacy be paid in cash.
Under the particular circumstances of this case, we conclude that one year from the date of his qualification should fix the outer limit of the period during which the executor, in the exercise of reasonable prudence, should have sold the N.A.L. stock.[*] By that time little remained, *459 or should have ordinarily remained, for the executor to perform except duties relating to the winding up of the estate. It is true that he had considerable opportunity to sell the stock at its inventoried value on various occasions during that period. However, since the executor's conduct was not characterized by bad faith, we deem he should not be surcharged for not selling the stock at its highest price during that one year period, but only for loss resulting from failure to sell at the market price at the end thereof. At that time the price was slightly over $20 per share.
[*] See 92 A.L.R., supra, at 442-443, indicating the variety of results reached in determining the outer limits of the proper date of disposition. E.g., In re Gray, 91 N.Y. 502 (Ct. App. 1883) (18-month period exempting executor from duty to account considered a convenient guide absent modifying facts); In re Douglas, 60 App. Div. 64, 69 N.Y.S. 687 (App. Div. 1901) (one year considered reasonable period for disposition where executor retained bonds he was not authorized to invest in with estate funds); In re Borell's Estate, 256 Pa. 523, 100 A. 953 (Sup. Ct. 1917) (duty to convert personalty of estate within one year of the grant of letters testamentary disregarded by the Supreme Court and lower court); Grayburn v. Clarkson, L.R. 3 Ch. (Eng.) 605 (1868) (one year period triggers a prima facie rule requiring executors to explain why they did not convert within that period); Hiddingh v. Denyssen, L.R. 12 App. Cas. (Eng.) 624 P.C. (1887) (six months held reasonable period for executor to sell stock).
In view of the quantity of stock involved we are of the opinion that the executor should be entitled to an allowance of one dollar per share representing any "blockage factor." In this connection, we note that the executor owned only 3,607 shares of a total of 1,300,000 outstanding. It also appears that between 10,000 and 27,800 shares changed hands each month during 1965, and between 7,300 and 31,000 monthly in 1966. The expert witnesses seem to be in agreement that these circumstances resulted in a relatively "thin" market on this stock, and that if the executor's holdings were sold in small blocks, a period of at least several months would be required to dispose of the entire amount to avoid an appreciable adverse effect on the market price. It was also agreed that some price concession would have to be made to the broker to protect him from loss in a changing market if the stock were sold in a single block. We arrive at the conclusion that such a blockage factor should be allowed notwithstanding the *460 fact that the Transfer Inheritance Tax Department, in accepting the executor's original appraisal value of 29-5/8, refused to make a similar allowance.
While we have concluded that the executor should be surcharged, we are of the opinion that under the circumstances of this case the award of commissions and counsel fees was proper inasmuch as the services he and his firm rendered were necessary to the proper administration of the estate.
The matter is remanded to the trial court for computation of the exact amount for which the executor shall be surcharged on the basis set forth herein and the entry of an appropriate order. Interest on the amount of the surcharge shall run only from the date of original order of distribution.