*In re* ESTATE OF ROY W. LINDBERG, Deceased.—(ALVAR G. LINDBERG *et al.*, Petitioners-Appellants, *v.* BEVERLY BANK, Respondent-Appellee.)

First District (2nd Division)    No. 79-2447

Opinion filed April 7, 1981.—Modified on denial of rehearing July 28, 1981.

Klein, Thorpe & Jenkins, Ltd., of Chicago (Gerard E. Dempsey and Gregory A. Thorpe, of counsel), for appellants.

Anagnost & Anagnost, of Chicago (Catherine Cook Anagnost and David H. Armstrong, of counsel), for appellee.

Mr. JUSTICE STAMOS delivered the opinion of the court:

The petitioners in this action are certain beneficiaries under the will of the decedent, Roy W. Lindberg. Petitioners seek the removal of the

Beverly Bank as executor of decedent's estate, and object to the respondent executor's first and final account. Petitioners also request that the executor be surcharged for losses caused petitioners by the tardy liquidation of the estate's assets. Following a bench trial, the court below entered judgment for the respondent Beverly Bank (the Bank). Petitioners have appealed.

The parties are now before this court for the second time. When the matter first went to trial, the trial court entered a directed finding for the Bank at the close of petitioners' case in chief. Petitioners appealed, and we reversed (*In re Estate of Lindberg* (1979), 69 Ill. App. 3d 714, 388 N.E.2d 148), finding that the trial court's conclusion that the Bank had acted reasonably was against the manifest weight of the evidence. (69 Ill. App. 3d 714, 723.) We held that petitioners' evidence established the Bank's breach of its duty as executor, and we remanded the cause to allow the Bank to go forward with evidence that it acted reasonably in disposing of the estate's assets. (69 Ill. App. 3d 714, 724-25.) Our earlier opinion in *In re Estate of Lindberg* contains a recital of petitioners' evidence, so those facts will not be repeated here. Instead, we will consider the Bank's evidence, adduced on remand, in order to ascertain whether the trial court's second finding in favor of the Bank is supported by the evidence.

The dispute is centered on the executor's liquidation of 2000 shares of Beverly Bancorporation (Bancorp) that decedent owned at the time of his death. Bancorp is a holding company, owning nearly all of the shares of the Bank. When decedent died in July 1973, Bancorp stock was valued at $70 per share. The Bank was named executor in September 1973. The legatees refused distribution in kind, and the Bank was therefore aware of its duty to sell the stock. Nevertheless, the estate's shares were not disposed of until February 1976. During the period from September 1973 through February 1976, the value of Bancorp stock declined. The stock was eventually sold for $27 per share, which appears to have been its fair market value in February 1976. Petitioners contend that the estate was unnecessarily depleted by the delay in selling the Bancorp shares.

On remand, the trial court heard testimony from six witnesses for the Bank. The testimony of these witnesses provides insight into the market for Bancorp stock during the relevant period. Bancorp stock was not listed on any stock exchange, and was not listed for "over the counter" trading. Prospective buyers or sellers of Bancorp stock would contact the Bank; these inquiries were usually directed to the Bank's president or chairman of the board. The president and chairman passed the information on to the Bank's secretary, who kept a list of prospective sellers, including the number of shares offered and the price asked. When an inquiry to buy matched an offer to sell, the parties were notified and the transaction was arranged. Robert Hanson, the Bank's secretary, testified

that he kept no list of prospective buyers because there were no inquiries to buy Bancorp stock during this period.

According to the testimony, the period was one of general decline for bank stocks, owing to conditions in financial markets nationally. Nevertheless, one Bank officer recalled an offer to purchase Bancorp stock. John Pollock, senior trust officer at the Bank, testified concerning an inquiry made early in 1974 by Bacon & Whipple, a stock brokerage, to buy a "couple hundred" shares of Bancorp at about $54 per share. Pollock related that Isaac Moore, president of the Bank, suggested that the offer was too low. No sellers were contacted, and no one followed up on Bacon & Whipple's inquiry.

The listing procedure outlined above provided the ordinary means of marketing Bancorp stock. Four of the Bank's witnesses testified concerning the Bank's specific efforts to sell the Lindberg estate's shares. Thomas Markle, former president of the Bank, stated that he made no specific effort to sell the Lindberg stock; he indicated that the shares were listed on the secretary's "sell" list and were thus accessible to inquiries to purchase. John Pollock, the Bank's senior trust officer, testified that he had offered the Lindberg stock to Lawrence Kahme, a Bancorp stockholder, for $40 per share. This offer was made in the hallway during a May 1974 Bancorp stockholders' meeting. Kahme rejected the offer. Pollock also stated that he did not discuss sale of the Lindberg shares with any other Bancorp stockholders (other than the officers and directors of the Bank), and did not contact any brokers regarding sale of the estate's shares. Robert Hanson, secretary of the Bank and of Bancorp, testified that he did not contact anyone regarding sale of the Lindberg shares. George Carroll, a Bancorp stockholder, also testified. He related that, at a party in January 1974, Robert Grossman (the attorney for the Lindberg estate) offered the Lindberg shares for sale. Carroll related that he declined Grossman's offer. At no time did the Bank petition the probate court for instructions, either on the sale of the depreciating stock, or on the potential conflict inherent in managing an estate comprised principally of shares in the Bank's parent corporation.

Our earlier opinion described a "crucial period" from September 1973 through December 1974 (the period between the Bank's appointment as executor and the time when Bancorp stock first fell to a $27 selling price). We there identified the issue as whether the Bank, during that crucial period, made a reasonable effort to sell the stock. (69 Ill. App. 3d 714, 724.) The Bank's evidence established that during this 15-month period, the Bank made one attempt to sell the Lindberg shares: John Pollock's offer to Lawrence Kahme at Bancorp's May 1974 annual meeting. Another offer to sell the shares was made by Robert Grossman, who was the attorney for the estate.

■■■ The standard of care required of the administrator of an estate was set forth in *Christy v. Christy* (1907), 225 Ill. 547, 80 N.E. 242. An administrator must possess the highest degree of fidelity, and utmost good faith, and the skill that an ordinarily prudent man bestows on his own affairs. (225 Ill. 547, 552-53; see also *In re Estate of Venturelli* (1977), 54 Ill. App. 3d 997, 1002, 370 N.E.2d 290 (applying the *Christy* standard to executors).) The issue is not whether an ordinarily skillful executor would have succeeded in selling the estate's shares at a better price; the issue is whether the Bank made a reasonable attempt in the instant case. In our earlier opinion, we held that the Bank did not make a reasonable effort to sell the stock:

> "[A]n ordinarily prudent man, conducting his own affairs in similar circumstances, would have made more of an effort to sell the stock. [Citation.] We therefore hold that petitioners made out a sufficient showing to require the Bank to go forward with evidence that it did act reasonably and prudently in the disposition of the stock." (69 Ill. App. 3d 714, 724.)

The Bank's evidence on remand added little to that adduced in the earlier portion of the trial. The Bank emphasized the difficulty of marketing Bancorp stock, but the Bank provided no new evidence of any reasonable effort to sell the Lindberg shares. On the contrary, the Bank's evidence reveals that the Bank did little more than wait passively for an offer to purchase the shares. We held in our prior opinion that the trial court's directed finding for the Bank was against the manifest weight of the evidence. (69 Ill. App. 3d 714, 725.) The additional evidence offered on remand does not provide the basis for a contrary result, so the trial court's second finding in favor of the Bank remains contrary to the manifest weight of the evidence. We need not define the scope of an executor's duty with respect to the sale of an illiquid asset. We have noted that the Bank failed to list the shares with any stockbrokers, and failed to announce the availability of the Lindberg shares to the group most likely to purchase them—present Bancorp shareholders. The Bank's most significant preterition, however, was its failure to petition an informed probate court for instructions, once it appeared that the shares could not be liquidated within a reasonable time.

Illinois law provides that an executor can be surcharged for diminution of an estate caused by his failure to liquidate the estate's assets within a reasonable time. (See *In re Estate of Busby* (1937), 288 Ill. App. 500, 538, 6 N.E.2d 451.) Petitioners herein have asked this court to forego remand and to enter judgment in their favor. We note that the decedent died in 1973, and the instant dispute regarding the sale of stock has been in litigation for 5 years. (*Cf. In re Estate of Barbera* (1973), 55 Ill. 2d 235, 239-40, 302 N.E.2d 302 (because case was in litigation for 6 years, supreme

court did not remand but entered judgment for petitioner).) We agree with petitioners that justice demands a prompt disposition of this controversy. Nevertheless, we find that certain elements of the relief requested by petitioners require a remand to the trial court. Specifically, *petitioners have asked that the Bank be removed as executor. We find that this relief is merited.* It follows that an administrator d.b.n. must be appointed, a task best left to the probate court. We will, however, address the issue of damages in order to provide the trial court with a formula for fixing the surcharge to the Bank.

■■ The measure of petitioners' damage must be based on the amount that the shares would have brought had the Bank acted with ordinary skill and prudence. Our first task is to ascertain the time period within which an ordinarily prudent executor would have disposed of the shares. Petitioners contend that a 6-month period is appropriate. Petitioners' expert witness suggested this figure and the court in *Busby* also allowed a 6-month period of disposal of securities. (288 Ill. App. 500, 539.) We find, however, that the courts have been far from uniform in establishing "reasonable periods" within which stock is to be sold, and the time spans have varied between 6 and 18 months. (See generally Annot., 92 A.L.R. 436 (1934).) We are not persuaded that the 6-month period established by the court in *Busby* should apply here. In *Busby*, the securities involved were readily marketable on various exchanges, and the court in *Busby* noted that the entire portfolio could have been sold within a 48-hour period at prevailing market prices. (288 Ill. App. 500, 539.) In the instant case, the marketability of the stock was one of the major issues. Failing to find any Illinois cases involving a publicly held but thinly traded stock, we have reviewed cases from our sister States. The circumstances of *In re Estate of Bayles* (1970), 108 N.J. Super. 446, 261 A.2d 684, are analogous to those of the case at bar. The stock considered in *Bayles* was not listed on any exchange but was handled by brokers who made a market for the stock. The court in *Bayles* held that 1 year was a reasonable time period for the executor to sell the stock. (108 N.J. Super. 446, 458-59, 261 A.2d 699, 691.) We are of the opinion that a 1-year period is also appropriate for the present case. Furthermore, we believe that the 1-year period began on September 24, 1973, the date the Bank was appointed executor.

The next task is the ascertainment of the appropriate selling price within the 1-year period. On this question, some courts have used the selling price as of the end of the "reasonable period" (see *In re Lewis' Estate* (1942), 344 Pa. 586, 590, 26 A.2d 445, 447); some have used the lowest price within the applicable period (see *In re Estate of Campbell* (1973), 190 Neb. 456, 459-60, 209 N.W.2d 165, 168); and one court has suggested that an executor might be surcharged on the basis of the highest selling price within the applicable period. (See *Bayles*, 109 N.J. Super.

1146, 458-59, 261 A.2d 654, 691 (suggesting that an executor's bad faith may warrant such a sanction).) We subscribe to the analysis offered by Judge Learned Hand in *Marcus v. Otis* (2d Cir. 1948), 168 F.2d 649, 659:

"Presumably the most profitable way to dispose of so many shares would have been to feed them on the market gradually, and the best approximation to what would have been so realized, would be to take the average over the whole period."

This is the approach adopted by the court in *Busby*, 288 Ill. App. 500, 539.

In our earlier opinion concerning this cause, we set forth a list of known transfers of Bancorp stock. (69 Ill. App. 3d 714, 717.) The table below duplicates the earlier list, but omits transactions before and after the relevant period (September 24, 1973, through September 23, 1974), and omits transactions at an unknown price:

| DATE | NUMBER OF SHARES | PRICE PER SHARE |
|---|---|---|
| December 7, 1973 | 12 | $70.00 |
| February 22, 1974 | 1,500 | 60.00 |
| February 22, 1974 | 116 | 54.50 |
| May, 1974 | 1,100 | 57.50 |
| June 12, 1974 | 14,500 | 57.50 |
| June 22, 1974 | 8 | 57.50 |
| September 11, 1974 | 196 | 40.00 |

Calculating from this list, we observe that 17,432 shares changed hands during the 12-month period, and brought in (in the aggregate) $1,002,462. The mean price per share during the relevant period was therefore $57.51.

It is obvious that the mean selling price during the 1-year period was heavily influenced by the single largest transaction: the sale of 14,500 shares at $57.50 per share. The Bank contends that this was a "negotiated sale" and is not representative of trading in general. Regardless of the label attached, we find that the fact that the sale occurred indicates that some entity wanted a large amount of Bancorp stock and was willing to pay the current price. The fact that the mean price during the 12-month period is nearly equivalent to the prevailing price early in the period reflects the fact that a higher price could have been obtained had the Bank acted with greater dispatch when the stock was more active.

The Bank held 1,834 shares of the estate's Bancorp stock, and eventually sold them at $27.00 per share. Since we find that reasonable efforts would have netted $57.51 per share, the estate suffered a loss of $30.51 per share, or a total of $55,955.34. Six of the estate's nine beneficiaries have participated in this litigation, and the surcharge to the Bank must

take this fact into account. We therefore find the Bank liable to petitioners in the amount of $37,303.56 (6/9 of $55,955.34), with interest at the legal rate. Interest will accrue from September 23, 1974, the end of the 1-year period. See *Busby,* at 539.

■■ As noted above, the Bank should be removed as executor for the estate (see *Busby,* at 542), and a new administrator appointed. Case law provides that an executor who breaches his fiduciary duty is not entitled to an executor's fee (see *In re Estate of Minsky* (1978), 59 Ill. App. 3d 974, 979, 376 N.E.2d 647), and the new administrator's final account should take this fact into consideration.

For the foregoing reasons, the judgment of the trial court is reversed, and the cause is remanded to the trial court with directions to enter judgment for petitioners consistent with this opinion.

Reversed and remanded with directions.

HARTMAN, P. J., and DOWNING, J., concur.