Hillsborough County Probate Court
No. 87-117

*In re* ESTATE OF CHARLES F. McCOOL

December 30, 1988

*Gallagher, Callahan & Gartrell P.A.*, of Concord (*Steven J. McAuliffe* and *Michael R. Callahan* on the brief, and *Mr. McAuliffe* orally), for the petitioners.

*Wiggin & Nourie*, of Manchester (*Dort S. Bigg* and *Diane M. Smith* on the brief, and *Mr. Bigg* orally), and *McLane, Graf, Raulerson & Middleton*, of Manchester (*Jack B. Middleton* and *Robert A. Wells* on the brief, and *Mr. Middleton* orally), for the petitionee.

JOHNSON, J. The petitioners, Paul McCool and Barbara Pitts, brother and sister of Charles McCool and beneficiaries of the estate of Charles McCool (the Estate), appeal from a decree of the Hillsborough County Probate Court (*Cloutier*, J.) disposing of their objections to the first account filed by the Estate's original executor, the present petitionee, Attorney Robert Bossie. They ask that we reverse the probate court's decisions: first, to impose no surcharge upon Attorney Bossie, who served as the Estate's executor and legal counsel from January through November 1984; and second, to award partial executor's and legal fees to him and to his firm. They argue that these requests are justified because the executor's actions were tainted by incompetence and conflicts of interest. For reasons stated below, we reverse and remand the probate court's decision on the issue of surcharge, and reverse its decision as to executor's and legal fees.

The alleged instances of misconduct or lack of competence of which the petitioners complain on appeal arose in the following factual setting. In December 1983, Charles McCool was killed when the light airplane he was piloting crashed in New Mexico. Mr. McCool's only passengers, his live-in companion Cheryl Hendrickson and their two children, Sean and Devin McCool, also died in the crash. Attorney Bossie, who had prepared Mr. McCool's will, was appointed executor of the Estate in accordance with the terms of that will in January 1984. Following his appointment, Attorney Bossie hired his law firm, Bossie, Kelly & Hodes, to act as the Estate's legal counsel. Soon afterwards, the probate court made

Cheryl Hendrickson's father executor of her estate and petitioner Paul McCool administrator of the estates of Sean and Devin McCool. Bossie, Kelly & Hodes then agreed to represent these estates as well as the estate of Charles McCool.

Within a short time after the December airplane crash, it became evident that the probable cause of that accident had been Charles McCool's negligence. In light of this, Attorney Bossie and his firm recognized that wrongful death actions should be brought against Charles McCool's estate on behalf of the estates of Ms. Hendrickson and each of the two children. In pursuit of these claims, Attorney Bossie and the members of his firm shared information among themselves and on behalf of the several estates regarding the nature and extent of available insurance coverage and other issues relevant to the various wrongful death actions. Attorney Bossie, moreover, drafted insurance claim letters against himself as executor of Charles McCool's estate for execution by Mr. Hendrickson as executor of his daughter's estate and by Paul McCool as administrator of the children's estates. The conflicts of interest evident in these multiple representations and exchanges of information among members of the same firm, and the conflicts of interest, discussed below, in relation to representation of Eric Frey and Frey Associates, Inc., underlie the petitioners' appeal on the issue of executor's and attorney's fees.

The other major ground for petitioners' objection to the account, relevant to this appeal, arises from Attorney Bossie's failure to dispose of the Estate's principal asset. This asset consisted of 488,400 shares of stock in Frey Associates, Inc. (Frey Associates), a corporation specializing in developing and marketing computer equipment and artificial intelligence software. Charles McCool, who acted as head of marketing and sales for the corporation, owned approximately one-third of its outstanding shares. Eric Frey, the corporation's president, owned slightly more than one-third of those shares. The corporation had issued the remaining shares to the public via registration and public sale in accordance with federal law in autumn 1983.

Soon after Charles McCool's death, Eric Frey notified Attorney Bossie that he claimed the right to purchase the Estate's Frey Associates shares at "current equity value," in accordance with the terms of two stock purchase agreements into which Mr. Frey and Frey Associates had entered with Mr. McCool. The agreements in question specifically provided:

"In the event that [Charles] McCool, for whatever reason, terminates his employment with Frey Associates, Inc., he agrees to permit Frey Associates, Inc. and/or Eric Frey, individually, to repurchase all of the stock then owned by McCool at its then current equity value . . . ."

In this and subsequent conversations with Attorney Bossie, Mr. Frey contended that Mr. McCool's death terminated his employment with Frey Associates and triggered Mr. Frey's right to purchase the Estate's stock under the agreements. Despite the fact that a member of his law firm had drafted one of the documents, and the firm had reviewed the other and advised Mr. Frey and the corporation that these agreements provided adequate protection against an offering of the McCool stock to third parties, Attorney Bossie took the position that Mr. McCool's death did not trigger a right of purchase. All parties agree that "current equity value" is the equivalent of "book value," which was $1.80 per share at the time of Mr. McCool's death. During the time in question, the company's registered shares were selling on the over-the-counter market in the range of $11–$13 per share. However, the probate court found that neither Mr. Frey nor the corporation ever made "an offer" to purchase the McCool block of stock at book or any other value.

Since Attorney Bossie disagreed with Mr. Frey's claim and resisted selling the shares at "current equity value" in accordance with the agreements, it can be inferred that he hoped to sell McCool's shares to Mr. Frey, or to Frey Associates, at a higher price. Because he was also encountering many other difficulties in disposing of the stock, Attorney Bossie testified he retained the Boston law firm of Hale & Dorr, in late January 1984, to assist him in this task. The probate court determined that disposition of the Estate's shares was complicated not only by the ambiguity inherent in the agreements' provisions, but by Frey Associates' failure to disclose those agreements, as required by federal law, when the corporation "went public" in 1983. As a result of this failure, the stock purchase agreements were subject to the charge that they no longer had any force or effect. In addition, the Estate's shares of Frey Associates stock were unregistered, and thus subject to SEC Rule 144, which prohibits sale to the public of more than one percent of outstanding stock (in this case 15,000 shares) per quarter. Finally, the corporation was experiencing financial difficulties, the life expectancy of its product in the market was short, and its stock was thinly traded. The probate court ultimately found, and all parties now agree, that, except for the small

quarterly sales made to the public pursuant to Rule 144, these factors meant that Eric Frey and Frey Associates were the only potential buyers for the Estate's shares. The question was at what price the executor could reasonably sell those shares and whether Mr. Frey or Frey Associates could or would buy them at that or any other price.

As noted above, although there were discussions between Attorney Bossie and Mr. Frey between January and September, 1984, they never agreed on terms acceptable to both sides. The probate court found that during this time Attorney Bossie dealt with Mr. Frey without benefit of a valuation of the Estate's shares. With the assistance of Hale & Dorr, Attorney Bossie did retain Montgomery Securities on June 27, 1984, to value the stock, subject to the limitations described below. However, when Montgomery had provided no valuation by September 24, 1984, Attorney Hamel of Hale & Dorr undertook the valuation. Within a few days he had determined, for purposes of the estate tax return due on September 28, 1984, that the stock was worth 15 cents per share, both on the date of Mr. McCool's death and six months later. This value was said to represent the fair market value of the stock; and Attorney Bossie filed the estate tax return, under oath.

Attorney Bossie knew Mr. Frey because he had represented him in personal matters and served as counsel to Frey Associates. He also had some familiarity with the agreements in question, one of which his partner, Attorney Hodes, had drafted. At the time he became executor of the Estate, Attorney Bossie and his firm also represented Frey Associates in a tax abatement matter. However, on July 27, 1984, Attorney Bossie informed Mr. Frey that, because of potential conflicts of interest, the firm would have to resign as counsel both to him and to the corporation, at least until any disputes between Mr. Frey and Frey Associates and the Estate were resolved. Expert witnesses agreed, and the probate court found, that, in continuing to act for the Estate despite these connections with Mr. Frey and Frey Associates for nearly seven months, Attorney Bossie engaged in at least an apparent conflict of interest.

The petitioners argued below, and contend again in this court, that the combination of this conflict of interest and Attorney Bossie's lack of expertise caused him to fail to engage in serious negotiations regarding sale of the Estate's stock in response to suggestions by Mr. Frey of his willingness to purchase the stock. They argue that, because he lacked the necessary expertise in the area and knew that, due to his conflicts of interest, he might appear

unfairly to favor Mr. Frey and the corporation rather than the Estate, Attorney Bossie failed either to obtain a timely valuation of the stock or to engage in serious negotiations in response to offers to negotiate. They point, in particular, to conversations in which Attorney Bossie failed to pursue Mr. Frey's suggestions that he might be interested in purchasing the Estate's shares for book value or some price slightly above book value, or in purchasing forty percent of the Estate's shares for five to six dollars per share. They claim that Attorney Bossie summarily rejected Mr. Frey's offers to negotiate because he wrongly believed the stock to be worth its value in the over-the-counter market, when in fact it was worth only 15 cents per share. By the time he finally received a valuation and was in a position to bargain with Mr. Frey on realistic terms, the company's financial health was so poor that there was no longer any possibility that Mr. Frey or Frey Associates would purchase the stock.

In the face of mounting criticism, Attorney Bossie resigned as executor of the McCool Estate in November 1984. On the day following his resignation, he filed a final account of his administration of the Estate, to which the petitioners objected on numerous grounds. After a lengthy trial, the probate court determined, *inter alia*, that imposition of a surcharge on the executor was unwarranted. It further determined that Attorney Bossie and his firm, who had requested executor's fees of $9,500 and legal fees of $19,855.70, were entitled to only one-half of the maximum fee of $17,437.26 allowable under probate court guidelines, or $8,718.63. Petitioners then brought this appeal.

Based on their characterization of the facts, the petitioners make the following legal arguments. On the issue of surcharge they first urge us to adopt a rule placing the burden of disproving damages on the executor or attorney who has breached his fiduciary duty by acting without due care. They further contend that, whether or not we alter the burden of proof on damages, they have met the burden of proving by a preponderance of the evidence that Attorney Bossie acted without due care to the detriment of the Estate. With regard to fees, the petitioners argue that, because his representation of the Estate was ridden with conflicts of interest resulting both from his and his firm's representation of the several estates and from their prior representation of Mr. Frey and the corporation, we should hold that neither Attorney Bossie nor his firm was entitled to executor's or legal fees. They urge us to rule that an attorney who represents conflicting interests in violation of our

rules of professional conduct may receive no compensation for his services.

Attorney Bossie argues that the probate court applied the appropriate rule with regard to burden of proof. He further argues that the petitioners did not meet their burden of reasonably proving that the Estate suffered damage and that, since surcharge is appropriate only to compensate the beneficiaries for the Estate's losses, the probate court properly refused to impose a surcharge. Finally, he argues that conflicts of interest do not necessitate refusal to award any executor's or legal fees. Rather, he contends, an estate's executor or attorney is entitled to fees for services benefitting the estate; it is in the probate court's discretion to determine, in light of the particular facts of the case, the extent to which conflicts of interest warrant reduction of otherwise reasonable fees.

We first address the issue of surcharge. An executor must handle estate assets with that degree of prudence and diligence that a man of ordinary judgment would bestow on his own affairs of like nature. *In Re Estate of Dobson*, 417 A.2d 138, 142 (Pa. 1980); 33 C.J.S. *Executors and Administrators* § 184, at 1161 (1942). Unlike the trustee, whose responsibility is to hold assets, the executor must exercise prudence and diligence in the timely liquidation of assets. *See, e.g., McInnes v. Goldthwaite*, 94 N.H. 331, 333–34, 52 A.2d 795, 797–98 (1947); *In Re Estate of Bayles*, 108 N.J. Super. 446, 453, 261 A.2d 684, 688 (1970). What constitutes reasonable conduct with respect to estate assets varies with the circumstances of the case. 33 C.J.S., *supra* § 184, at 1163. "'[S]urcharge is the penalty for failure to exercise common prudence, common skill and common caution in the performance of the fiduciary's duty and is imposed to compensate beneficiaries for loss caused by the fiduciary's want of due care.'" *In Re Estate of Dobson supra* (quoting *Estate of Stephenson*, 469 Pa. 128, 138, 364 A.2d 1301, 1306 (1976)); *see also* 31 AM. JUR. 2d *Executors and Administrators* § 522, at 233 (1967).

In determining the validity of the petitioners' charges, the probate court applied the burden of proof standard traditional in actions for surcharge. It required the petitioners to prove, by a preponderance of the evidence, that Attorney Bossie acted without due prudence and diligence in disposing of the Estate's Frey Associates stock and that this lack of due care was a "direct and proximate cause of the loss to the [E]state." *Cf. In Re Estate of Lux*, 389 A.2d 1053, 1056–57 (Pa. 1978) (complaining party bears burden

of proving particulars of wrongful conduct); *In Re Estate of Lohm*, 440 Pa. 268, 273–74, 269 A.2d 451, 454 (1970) (complaining party bore burden of proving executor's lack of due care as cause of loss). As the amount of the Estate's loss was also the measure of the petitioners' damages, the probate court required them to "prove the loss with some particularity." The burden then shifted to the executor to rebut this evidence and demonstrate the absence of loss.

The petitioners ask us to impose a somewhat different burden of proof for those surcharge actions in which the executor's alleged lack of due care resulted from a conflict of interest. They urge that, in such cases, we should impose the initial burden of proving a conflict of interest on the complaining party. Once such a conflict was established by a preponderance of the evidence, the burden would shift to the executor to demonstrate that the established conflict resulted in no monetary loss to the estate.

We are sympathetic to the argument that the traditional rule imposes a burden on the petitioner alleging that loss to the estate resulted from the executor's inaction. We recognize that it is more difficult to prove that a given sale, for example, would have taken place, affording a certain monetary gain to an estate, than it is to prove that the executor's affirmative actions depleted funds an estate already possessed. We do not believe, however, that the rule the petitioners propose would relieve them from having to prove damages, as they suggest. Even if an executor failed to prove the absence of loss, it would still be necessary that the parties provide the court a reasonable basis on which to calculate the amount of damage. Since the executor's evidence would be aimed at proving that no loss occurred, the court would have to depend on the complaining party to prove the extent of that loss.

As explained below, we believe that we can effectively address the problems the petitioners present. However, we must do this not by altering the burden of proof, but by properly defining what it is that petitioners must show in order to meet that burden. The decision on which the petitioners rely most heavily itself espouses this principle. *Rippey v. Denver United States National Bank*, 273 F. Supp. 718 (D. Colo. 1967). *Rippey* does not stand for the proposition that any burden of proof regarding the fact or amount of harm shifts to the fiduciary once the complaining party has proven the existence of some specified state of affairs (*e.g.*, a conflict of interest). After receiving substantial evidence from the plaintiffs as to both the fact and the amount of damage, the *Rippey* court stated, "If there is uncertainty as to the extent of damage to the trust, there can be no doubt as to the fact of damage. In such a

case, [we] hold that damages are to be closely approximated by drawing reasonable and probable inferences from the facts proven." *Rippey, supra* at 744. Although certain other cases the petitioners cite do require the party causing loss to prove the amount of damage, they do so only after the party alleging damage has proven, to the court's satisfaction, that such damage in fact occurred. *See, e.g., Winter v. Brown,* 365 A.2d 381, 385 (D.C. Ct. App. 1976); *Baker v. Beal,* 225 N.W.2d 106, 110 (Iowa 1975).

The probate court found that Attorney Bossie acted reasonably by: (1) seeking the assistance of Hale & Dorr on questions of securities law, an area in which he himself lacked expertise; (2) hiring Montgomery Securities on June 27, 1984, to value the stock; and (3) refusing to act without a valuation of the stock. It specifically rejected the petitioners' contention that Attorney Bossie ought to have retained a firm to value the stock and received a valuation within 30 to 45 days of Mr. McCool's death, although it did not determine by what date Attorney Bossie should reasonably have obtained a valuation. It further found that Attorney Bossie was not in a position to sell the stock without a valuation and that, under the circumstances, no one could have sold the stock in less than six months.

The court made these findings in light of its determination that neither Mr. Frey nor Frey Associates ever represented that they were ready, willing, and able to purchase the stock, and in recognition of the fact that valuation of the stock and negotiations to sell were complicated by the factors noted earlier. It specifically stated:

> "Had the Executor sold or offered to sell the stock at fifteen cents a share, without professional assistance when the stock was selling over the counter between ($11.00 and $13.00), it is clear that the Executor would not have acted in the best interest of the heirs and, therefore, would have been chargeable."

Based on these findings, the court determined that the Estate had suffered no damage as a result of Attorney Bossie's actions and therefore refused to impose a surcharge.

The petitioners contend that certain of the probate court's factual determinations were contrary to the weight of the evidence and that determinations consistent with the evidence would necessitate the conclusion that petitioners met the burden of proving that Attorney Bossie's actions with respect to the stock resulted in harm to the Estate, for which surcharge is the appropriate remedy. The challenged factual conclusions include the probate court's determi-

nation: (1) that the executor could not have obtained an appraisal sooner than he did; and (2) that the fact that Attorney Hamel made an appraisal over the course of 4 days, to meet a filing deadline, did not decisively show that Attorney Bossie could have obtained a reliable appraisal for evaluating potential offers in an equally short time. Petitioners charge that, because he ineptly failed to determine a proper selling price within a reasonable time and feared conflict of interest charges for selling to Mr. Frey at too low a price, Attorney Bossie failed vigorously to pursue an agreement with Mr. Frey at a time when sale would have been likely. Because our decision that the first of these findings was in error is sufficient to require remand, we do not specifically address the second.

Our scope of review of the probate court's factual findings is established by RSA 567-A:4, which states, "The findings of fact of the judge of probate are final unless they are so plainly erroneous that such findings could not be reasonably made."

Shortly after Attorney Bossie was named as executor of the McCool estate he knew, or should have known, (1) that the corporation was in a precarious financial condition, having lost one million dollars in the previous year, and having lost one million dollars per quarter in the period in question; (2) that the stock was thinly traded; (3) that a key figure in the corporation, Mr. McCool, had just died; (4) that McCool's block of stock was subject to restrictions of sale both by contract with Mr. Frey and Frey Associates and by securities law; and (5) that the corporation produced a high tech product whose life expectancy in the market was short. Attorney Bossie, to act prudently, had no choice but to do two things, and do them promptly: first, he had to obtain the best appraisal he could at the earliest date; and, second, he had to enter into meaningful negotiations for the sale of the stock with Mr. Frey. He did neither.

The probate court's finding that no one could have obtained an appraisal and sold the stock within six months cannot be sustained under these facts. The McCool stock, based on recent developments, was subject to rapid deterioration in value. Prudence called for fast action to effectuate a sale. All of the expert witnesses called by all parties agreed that in such a case the appraisal process should have begun rapidly. It may be that a "blue ribbon" appraisal could not have been obtained in less than six months. But this case called for an appraisal that was reasonable under these extraordinary circumstances to be made as soon as possible, so that sale negotiations could proceed. Common sense would indicate that a reasonable appraisal could have been made within several months

so that Attorney Bossie could begin to negotiate a sale of McCool's stock.

But Attorney Bossie effectively did nothing to obtain such an appraisal. He hired Hale & Dorr to assist him shortly after his appointment as executor. He testified he thought this law firm would assist him with the appraisal *for sale purposes*. Hale & Dorr, however, denied undertaking this task. What role he wanted Hale & Dorr to play should have been made crystal clear at the outset by Attorney Bossie, given the circumstances. It was not until Montgomery Securities was engaged to value the stock on June 27, 1984 (nearly six months after Attorney Bossie's appointment), that Attorney Bossie made a positive step to value the stock. But his effort was twice flawed. First, Montgomery Securities was to assume that the stock purchase agreements asserted by Mr. Frey did not exist. The contract read:

> "While it is further understood that a disputed right of first refusal and another contractual restriction on transfer may be applicable to any sales of such stock, in making such valuation, *we will assume that such right and restriction do not exist.*"

(Emphasis added.) The stock restrictions did, in fact, exist, however, and no appraisal assuming their non-existence could form the basis for meaningful sale negotiations.

Even more fatal, Montgomery Securities was *not* to make an appraisal *for sale purposes*, but only for *estate tax purposes*. The contract further read:

> "It is understood that our opinion will only be used for the purpose of determining your estate taxes under the laws of the United States and the State of New Hampshire. Our opinion will not be used by you for any other purpose, quoted or disclosed to any other person in any manner without our express prior written consent."

In essence, then, Attorney Bossie *never* engaged anyone to appraise the stock *for sale purposes*. Since such an appraisal was clearly a condition precedent to meaningful negotiations with Mr. Frey, Attorney Bossie totally failed in his fiduciary duties to the Estate and is therefore subject to possible surcharge. The probate court determination that surcharge could not be in order is error as a matter of law.

We therefore remand this case to the probate court. The probate court must first determine whether the McCool estate suffered loss to any degree. If Mr. Frey or Frey Associates lacked the financial

ability to purchase the stock in question, or had no desire to purchase the stock at any price, then the Estate could have suffered no loss for failure to sell the stock to Mr. Frey or Frey Associates. If these findings are made, there would be no "lost opportunities" for the sale of Frey Associates stock as the petitioners contend. However, the fact that the probate court found that Attorney Bossie never received an offer from Mr. Frey is certainly not conclusive on this issue. Attorney Bossie's own expert testified that Attorney Bossie's demands for the stock were "unrealistic"; hence, the fact that Attorney Bossie received no offer to purchase the stock is hardly surprising. Second, if the probate court finds that Mr. Frey or Frey Associates more likely than not would have accepted a realistic offer to sell, the court should then determine what the selling price would have been, and impose a surcharge accordingly.

■ Turning to the remaining issue, we hold that an attorney who violates our rules of professional conduct by engaging in clear conflicts of interest, of whose existence he either knew or should have known, may receive neither executor's nor legal fees for services he renders an estate. *See Silbiger v. Prudence Bonds Corporation*, 180 F.2d 917, 920–21 (2d Cir.), *cert. denied*, 340 U.S. 813 and 340 U.S. 831 (1950) (citing the traditional rule in such cases); *Moses v. McGarvey*, 614 P.2d 1363, 1372–73 (Alaska 1980) (no fees to attorneys, disqualified on conflict of interest grounds, from representing shareholders suing corporation); *Jeffry v. Pounds*, 136 Cal. Rptr. 373, 377 (Cal. Ct. App. 1977) (fees allowed for only those services preceding breach of professional conduct); *Bryant v. Lewis*, 27 S.W.2d 604, 608 (Tex. Ct. App. 1930) (attorney representing two clients with conflicting claims against estate was, as a result of his irreconcilable conflict, entitled to no fees). The attorney who acts for parties whose interests conflict may well be unable to provide the disinterested advice and zealous representation that he owes every one of his clients.

> "The requirement that an attorney shall not represent conflicting interests, at least without full disclosure to the client both of the facts and their significance, is designed 'to preclude the honest practitioner from putting himself in a position where he may be required to choose between conflicting duties, or be led to an attempt to reconcile conflicting interests rather than to enforce to their full extent the rights of the interest which he should alone represent.'"

*Hines v. Donovan*, 101 N.H. 239, 244, 139 A.2d 884, 888 (1958).

■ Our rules of professional conduct in effect at the time in question did not differ in meaning from the present rules. They required that a lawyer decline proffered employment or discontinue multiple employment "if the exercise of his independent professional judgment in behalf of a client [would] be or [be] likely to be adversely affected" by either the acceptance of new employment or the continued representation of another client. CODE OF PROFESSIONAL RESPONSIBILITY, DR 5-105(A) and (B); *cf.* RULES OF PROFESSIONAL CONDUCT, R. 1.7. DR 5-105(C) stated the only exception to this rule:

> "In the situations covered by DR 5-105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each."

DR 5-105(D) disqualified not only the individual lawyer in question, but also any "partner or associate of his or his firm," from accepting or continuing the prohibited employment. CODE OF PROFESSIONAL RESPONSIBILITY, *supra* at DR 5-105(D).

The probate court found that Attorney Bossie had a conflict of interest when he and his firm represented the various estates. It further found a conflict with respect to prior and ongoing representation of Frey Associates by Attorney Bossie and the firm. These conflicts, which culminated in Attorney Bossie's actually drafting insurance claim letters against himself as executor of Charles McCool's Estate and considering arguments that questioned the meaning of an agreement his firm had drafted, are too patent to allow us to entertain the claim that he did not recognize his duty either to refuse or discontinue representation or to comply with the requirements of DR 5-105(C).

■■ Contrary to the probate court's findings, the relevant parties did not waive their rights to object to these conflicts. The record clearly demonstrates that, even if it was "obvious" that he could satisfactorily represent the conflicting interests, Attorney Bossie never fully explained to Paul McCool, as beneficiary of Charles McCool's estate and administrator of the estates of Sean and Devin McCool, the nature and possible ramifications of these conflicts. That he included Paul McCool in meetings and correspondence revealing past and present representation did not satisfy his duty of full disclosure under DR 5-105(C). *See, e.g., In Re Holmes,* 290 Or. 173, 176-80, 619 P.2d 1284, 1288-89 (1980);

*International Business Machines Corp. v. Levin,* 579 F.2d 271, 281–82 (3d Cir. 1978). It is the attorney who bears the burden of fully disclosing relevant facts and making their ramifications clear. Moreover, because he was both the executor and the attorney for Charles McCool's Estate, Attorney Bossie could not waive the Estate's objections to his own conflicts of interest. Because representation of the Estate was fraught with conflicts of interest from its inception, we reverse the probate court's award of partial executor's and legal fees. Attorney Bossie and his firm are entitled to no such fees from the estate of Charles McCool.

 We decline to grant the petitioners' request that they be awarded their reasonable costs and attorney's fees, because of the novelty of the issues raised before us; and we decline to address the issue relating to attorney's fees in the wrongful death action of Ms. Hendrickson, because that issue is not before us.

*Reversed and remanded.*

BROCK, C.J., did not participate in the decision; the others concurred.