25 N.J. Super. 109 (1953)
95 A.2d 599
HARRY BEHRMAN, JOHN J. HALL, ALOYSIUS J. O'BRIEN, AMOS H. RADCLIFFE AND CHARLES H. ROEMER, TRUSTEES UNDER A TRUST AGREEMENT DATED DECEMBER 26, 1934, BETWEEN THEM AND THE FRANKLIN TRUST COMPANY OF PATERSON, PLAINTIFFS,
v.
JOHN J. EGAN AND GEORGE LENDRIM, AS REPRESENTATIVES OF THE HOLDERS OF CLASS "A" CERTIFICATES; AND WILLIAM E. BROWNE AND MOSES I. FULD, AS REPRESENTATIVES OF THE HOLDERS OF CLASS "B" CERTIFICATES, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided February 9, 1953.
*111 Messrs. Randal B. Lewis, Walter D. Van Riper, William W. Evans, and Samuel Rochlin, attorneys for the plaintiffs.
*112 Mr. Walter J. Hunziker, attorney for defendants Egan and Lendrim.
Mr. Vincent C. Duffy, attorney for defendants Browne and Fuld.
Messrs. Herman H. Singer and Albert S. Gross, attorneys for estates of James H. O'Dea, et als.
Messrs. Samuel Kaufman, and Sanford Freedman, attorneys for certificate holders, exceptants to the account (and of counsel).
Mr. George F. Miller, attorneys for estate of Joseph Teshon, et al.
Messrs. Frankel & Frankel, attorneys for intervenor Nathan Metzger.
GRIMSHAW, J.S.C.
In a prior opinion filed in this cause, Behrman v. Egan, 17 N.J. Super. 598 (Ch. Div. 1951), I reviewed at length the facts and circumstances leading up to the present litigation. A repetition of that recital would serve no useful purpose.
After a study of the record then before me, I expressed the view that the charge of fraud in connection with the procurement of the 1946 decree of the former Court of Chancery had not been sustained. I still hold that opinion. In its decree the Court of Chancery approved the transfer of the bank building from the trust to the Franklin Trust Company for the sum of $75,000. It also gave its sanction to an increase in the capital of the bank.
It may be conceded that the certificate holders were not given sufficient notice of the 1946 proceeding. However, I am inclined to the view that the failure to give such notice was due more to ignorance than to design. In any event, because of the lack of notice the exceptants were afforded an opportunity to present further testimony on the subject. *113 After a full disclosure of all of the facts I find no reason to alter the conclusions heretofore expressed.
The hearings were reopened for the purpose of affording the trustees an opportunity to explain and justify the administration of the trust, particularly with reference to certain phases of that administration to which reference has heretofore been made. A great volume of testimony was taken. A large part of that testimony was unsatisfactory and vague. However, such as it was, it is the record upon which the trustees must be judged.
It is necessary to keep in mind that in this State trustees are held to the highest standards of conduct in their dealings with the trust. Our courts have repeatedly quoted with approval the rule of conduct laid down by Mr. Justice Cardozo, then a Judge of the New York Court of Appeals, in Neinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 546, 62 A.L.R. 1 (Ct. App. 1928):
"Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the `disintegrating erosion' of particular exceptions. * * * Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court."
Taylor v. Errion, 137 N.J. Eq. 221 (Ch. 1945), affirmed 140 N.J. Eq. 495 (E. & A. 1947); Bankers Trust Co. v. Bacot, 6 N.J. 426 (1951); In re Koretzky, 8 N.J. 506 (1951).
It is urged on behalf of the trustees that the trust agreement relieves them from all responsibility for actions other than those which were the result of conscious wrongdoing. In support of this contention they cite Article III, paragraph 9 of the trust agreement which is as follows:
*114 "9. No Trustee, nor any member of the Board of Trustees, shall be responsible for any act, omission or default of any other Trustee or of any agent, employee or attorney employed by them or any of them, nor for any mistake, or error of judgment; nor shall he incur any liability except for his individual malfeasance."
In my opinion, the contention that the exculpatory clause saves the trustees from any penalty for conduct other than that which would, in effect, constitute an indictable offense, is untenable. Discussing exculpatory clauses in trust agreements, the Supreme Court in Blauvelt v. Citizens Trust Company, 3 N.J. 545 (1950), had this to say:
"While consideration is given to such exculpatory provisions the courts construe them strictly and there appears to be a tendency to view such provisions with a searching scrutiny of the relation existing between the parties and the circumstances of the insertion of such a clause in a trust instrument. See Scott on Trusts, Vol. 2, Par. 222, pp. 1174 et seq. for a full discussion of the subject. Our courts have applied a strict construction to such exculpatory clauses. Tuttle v. Gilmore, 36 N.J. Eq. 617 (E. & A. 1883); Conover v. Guarantee Trust Co., 88 N.J. Eq. 450 (Ch. 1917) affirmed 89 N.J. Eq. 584 (E. & A. 1918); and have said that they do not relieve a trustee of liability where a loss results from negligence in the administration of the trust. Liberty Title & Trust Co. v. Plews, 142 N.J. Eq. 493 (Ch. 1948); Dickerson v. Camden Trust Co., 140 N.J. Eq. 34 (Ch. 1947) affirmed 1 N.J. 459 (Sup. Ct. 1949). The conduct of the trustee then is to be measured by the principle that a trustee owes an obligation to the cestuis and a duty to exercise that degree of care, prudence, circumspection and foresight, that an ordinary prudent person would employ in like matters of his own. See In re Griggs, 125 N.J. Eq. 73 (Prerog. Ct. 1939) affirmed sub nom In re Paterson National Bank, 127 N.J. Eq. 362 (E. & A. 1940); In re Buckelew's Estate, 128 N.J. Eq. 81 (Prerog. Ct. 1940); In re Ebert, 136 N.J. Eq. 123 (Prerog. Ct. 1945); Braman v. Central Hanover Bank & Trust Co., 138 N.J. Eq. 165 (Ch. 1946); Dickerson v. Camden Trust Co., supra. Also cf. R.S. 3:16-12 N.J.S.A."
And, in Conover v. Guarantee Trust Co., 88 N.J. Eq. 450 (Ch. 1917), affirmed 89 N.J. Eq. 584 (E. & A. 1918), it was held that:
"Trustees are bound to observe the limits placed upon their powers, either by law or by the trust instrument, and if they *115 transcend such powers and cause damage to the estate they will be held responsible therefor, although they may have acted in perfect good faith."
The examination into the operations of the trustees has disclosed a number of irregularities and actions beyond the "limits placed upon their powers." In some cases, without an investigation of the debtor's ability to pay, the trustees accepted as setoffs against obligations, "A" certificates obtained by the debtor after the bank was closed. In each instance the setoff was for the face value of the certificate in spite of the fact that it had been acquired for a small part of its face value. The result of this practice was that the debtors so favored, among whom were employees of the bank, were able to settle their obligations for a fractional part of the debt.
This practice was condemned in Singac Trust Co. v. Totowa Lumber, &c., Co., 112 N.J.L. 99 (E. & A. 1933). There the court pointed out that recognition of such a transfer would create a preference in favor of the certificates so assigned and went on to say:
"* * * a mere right to participate pro rata, in accordance with the statute, in the amount realized through the liquidation of the assets of the bank, cannot be transmuted into a legal claim, good for the entire amount of the credit transferred, by the assignment of such credit to a debtor of the bank in liquidation, so that such debtor might set it off in full against his debt. A claim in the hands of an assignee in these circumstances has no better standing than it had in the hands of its original owner. The claim cannot be enlarged by the talisman of assignment."
See, also, Jefferson Trust Co. v. Feinstein, 122 N.J. Eq. 188 (Ch. 1937), affirmed 123 N.J. Eq. 588 (E. & A. 1938).
The face value of "A" certificates, accepted as setoffs against obligations, without a proper examination having been had into the question of the debtor's ability to pay, was the sum of $22,646.82. The testimony of the accountant indicates that the total dividend will amount approximately to 50% of the face value of the "A" certificates. If that *116 amount is realized, the liability of the trustees for the improper offset will be $11,323.41.
In a large number of other cases the practice adopted by the trustees was extraordinary. Debtors would make cash payments on account of obligations. Instead of depositing the cash and giving the debtor a suitable credit, the trustees retained the cash. From time to time this fund was used to purchase certificates at a discount and the certificates were then credited at face value against the account of the debtor. No record of the amount of cash so received was produced.
As is inevitable when such careless methods are used, discrepancies came to light. In one case a debtor paid $2,200 in cash on account of his note. The cash payment was not credited. Instead, an "A" certificate in the face amount of $2,000 was purchased by the trustees for $517. This certificate was then credited at its face value on the debtor's account. No explanation concerning the disposition of the balance of the $2,200 payment was given.
In another similar transaction $800 disappeared. And in a number of other cases smaller amounts of cash were not accounted for. The total amount of the cash payments handled in this fashion was not proven, nor is it likely to be, since apparently no record of them exists.
These transactions were items of discharge. The burden of establishing that they were proper rested on the trustees. In re Atkinson's Estate, 86 N.J. Eq. 173 (E. & A. 1916). That burden the trustees have failed utterly to sustain.
The amount of certificates used in this fashion was $26,048.71. The amount of cash paid by the debtors not being established, the trustees must be surcharged for the entire amount.
In 1927 the Franklin Trust Company was appointed guardian of four children named Hodge. At that time the bank, as trustee of an estate, held a mortgage in the principal amount of $4,000. This mortgage the bank transferred to itself as guardian of the Hodge children. One of the children reached her majority in 1935 and received her share of the estate. Thereafter, claim was made on behalf *117 of the remaining children that the mortgage was an illegal investment. Suit was threatened. The mortgage had not been included in the list of assets of the trust and, of course, the guardianship was not a matter with which the trustees were concerned. Nevertheless, when claim was made against the bank on behalf of the Hodge children, the trustees assumed the liability and paid the sum of $3,000 in settlement. They took over the mortgage and subsequently foreclosed it, with a loss to the trust estate of $2,896.98. This loss, it seems to me, was not a proper one for the trustees to assume and it must be charged against them.
In my first opinion in this matter, reference was made to the sale of the George Street mill, title to which was in the name of Frankham Realty Company, a wholly owned subsidiary of the trust estate. The mill property was the main asset of the Frankham Realty Company. On August 2, 1943 Frankham Realty Company contracted to sell the property to Benjamin Garfinkle and Lester Entin for the sum of $91,000. Mr. Garfinkle was a close business associate and friend of two of the trustees. The agreement for sale contained a provision for payment of a commission of 5% to a corporation known as Bengar Realty Company, which was wholly owned by Mr. Garfinkle. When the time for closing arrived, the vendees refused to take title unless a reduction in price of $5,000 was made. The reason for the demand was said to be that the cost of operating the boilers in the mill was higher than had been expected. No provision of the contract justified the demand. Mr. Garfinkle was a man of substance who could have been made to respond to a judgment had litigation been instituted. Yet the trustees submitted to the demand and conveyed the property for $86,000. And, although the contract provided that taxes were to be apportioned as of August 15, 1943, the trustees paid the taxes to January 1, 1944, for a further undetermined loss. Had the trustees been alive to their responsibilities they would have insisted upon a performance of the contract according to its terms. Their failure to stand upon their rights resulted in a loss to the trust estate of *118 $5,000, for which they must be surcharged. Bankers Trust Co. v. Bacot, supra.
The exceptants insist that the commission paid on the sale of the George Street property should be made the subject of a surcharge. No facts to support this contention were offered other than the close relationship between the parties. That, of itself, cannot serve as the basis for a surcharge.
Reference has been made heretofore to the sale by the trustees of property at 361 Fair Street, in the City of Paterson. The contract price was $12,000. Of this amount "A" certificates having a face value of $9,714.51 were accepted as part payment of the purchase price. So far as appears, the corporate vendee was responsible and could have been held to the terms of its contract. Since the most that can be realized from the certificates will be 50% of their face value, the resultant loss to the estate from this action will be $4,857.25, for which again the trustees must be held responsible.
There are other examples of loss to the trust estate occasioned by the failure of the trustees to proceed diligently with the collection of claims. One Atkins was indebted to the trust in a large amount. As collateral security he had assigned various notes of third persons. Atkins became a bankrupt. A number of the collateral notes were worthless. However, among them were two notes, one for $550 and the other for $500. The makers of these notes were fully able to pay them. Because the trustees did not make any attempt to collect the two notes, the trust suffered a loss of $1,050.
One Leon Bruera was the holder of an "A" certificate in the amount of $5,395.40. Had he retained his certificate, Mr. Bruera ultimately would have received in dividends on this certificate 50% of the face amount, or $2,697.70. Mr. Bruera threatened suit. Instead of resisting the claim, the trustees paid Bruera the sum of $3,572.16. To the extent of $874.46, this payment was preferential.
Mr. Radcliffe, one of the trustees, was indebted to the trust in the sum of $135.82. He paid on account of the obligation *119 the sum of $10.53. The balance of $125.29 was written off. The amount involved is small, but it is illustrative of the disposition of the trustees to play favorites.
In some if not all of the cases cited above, there may have been some satisfactory explanation for the course of action taken. The burden was on the trustees to justify their action. They did not do so. Pleas of faulty memory and lost records at this time will not avail them. Had they taken the prudent and obvious course of making periodic reports of their stewardship, memories would have been fresh, records extant and lips now sealed by death could have spoken. They chose to withhold an accounting and they must be judged by the records as they now exist and be charged accordingly.
Mention has been made of the Frankham Realty Company. That corporation was owned originally by the Franklin Trust Company and the Hamilton Trust Company. As a result of a series of events which need not be set forth, the trustees, on June 11, 1937, became the holders of all of the capital stock of the Frankham Realty Company. The sole asset of the corporation was the George Street mill. The sole creditor was the trust estate which held mortgages on the real property and notes given by the corporation. The corporation was not dissolved. Why, does not appear. Mr. Radcliffe was put in charge as president and Mr. Roemer was made secretary-treasurer. Just what the duties of Mr. Radcliffe were, was not shown. Mr. Roemer took over the legal details attendant upon the management of the mill property. Between 1937 and 1944, when the mill property was sold, Mr. Radcliffe received from the corporation the sum of $5,800 and Mr. Roemer was paid $4,031.60. Of this latter sum, $17.40 represented disbursements, so that his fees were actually $4,014.20.
Ordinarily, it might very well be that with proper authentication, which was lacking here, the payments would have been proper. But it must be remembered that both Mr. Radcliffe and Mr. Roemer were trustees under an agreement which specifically forbade the receipt by them of any compensation *120 whatsoever other than a reasonable attendance fee. Such a provision in a trust agreement is proper and understandable. Its enforcement could go far to secure an impartial administration of the trust estate. When these trustees, in defiance of the agreement and without the approval of the court, to which supervision of all trusts is committed, accepted compensation for activities on behalf of the trust, they did so at their peril and they must suffer the consequences. Mr. Roemer and the estate of Mr. Radcliffe, therefore, will be required to return to the trust estate the amounts received by them from the Frankham Realty Company.
I have discussed heretofore the fees of $19,704.28 paid by the trustees for legal services. Further comment on that subject is unnecessary. Mr. Roemer was given the opportunity to prove what part of that amount constituted disbursements. Beyond a general statement that he had expended $2,000 for court costs, he made no attempt to establish any disbursements. Giving full value to his testimony regarding expenditures, a credit to which it is hardly entitled, there remains the sum of $17,704.28 which must be returned by Mr. Roemer to the trust estate.
During the investigation it developed that some of the trustees purchased "A" certificates at a discount for their own benefit. It is conceded by the accountants that these certificates must and will be surrendered to the trust estate, together with the dividends heretofore paid on them. And it is also conceded that the sales of certificates by the trustees to the trust estate must be set aside. Further discussion of those items, therefore, is unnecessary.
Exception was taken to the payment of $36,000 in fees to Franklin Trust Company for acting as fiscal agent for the trustees. No statement or voucher has been offered in support of this charge. Presumably such a statement can be rendered. Until it is presented, however, the payments will be disallowed.
Over the years the trustees have used Frankham Realty Company and Benlin Securities Company, another *121 wholly owned subsidiary of the trust, as dummies for the purchase of "A" certificates at a discount. The purchase price generally was 15% of the face value of the certificates. The reason given for this action was that the trustees desired to reduce the number of outstanding certificates and did not want the vendors to know that the purchases were being made on behalf of the trust. It is true that these purchases were for the benefit of the trust. It is true, also, that the vendors were beneficiaries of the trust whose interests the trustees were charged with the duty of protecting. When the purchases were made the trustees knew that the liquidating dividends would be much higher than the amounts being offered. This information was concealed from the persons from whom the purchases were made. Such conduct, though resulting in no loss to the estate, was a violation of the duty owed by the trustees to the beneficiaries and deserves this court's severe condemnation.
Finally we come to the demand that the trustees be removed. Of course, the power of the court to remove trustees is not open to question. But the court is reluctant to exercise that power and only does so under extreme provocation. Braman v. Central Hanover Bank & Trust Co., supra; McAllister v. McAllister, 120 N.J. Eq. 407 (Ch. 1936).
Of the original trustees, only two, Mr. Roemer and Mr. Behrman, are still alive. Mr. Behrman submitted his resignation some time ago, leaving Mr. Roemer as the sole survivor of the original board of trustees. For the reasons given above, I am of the opinion that Mr. Roemer should no longer continue as a trustee. His resignation will be required. In re Koretzky, supra. On the other hand, neither Mr. Hall nor Mr. O'Brien became a trustee until after the acts complained of had taken place. They cannot be charged with responsibility for their predecessors' derelictions of duty. Accordingly, Messrs. Hall and O'Brien will be retained as trustees. If the exceptants desire representation I will entertain their application therefor.
*122 The following is a compilation of the several surcharges:

* * * * * * * *

(Compilation of surcharges omitted for publication purposes.)

* * * * * * * *
It will be noted from the above schedule that Mr. Hall was the beneficiary of an improper setoff to the extent of $636.35. Mr. O'Brien received similar preferential treatment to the extent of $457.00. Mr. Hall and Mr. O'Brien must reimburse the trust for these amounts.
Judgment in accordance with the views expressed above.