

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-6-1995

# Robertson vs. Center Jersey

Precedential or Non-Precedential:

Docket 94-5010

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Robertson vs. Center Jersey" (1995). *1995 Decisions.* Paper 33.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/33

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 94-5010
_____

MELISSA ROBERTSON,

Appellant

v.

THE CENTRAL JERSEY BANK & TRUST COMPANY,
JOHN DOES, Officers and Directors of the Central Jersey Bank,
and others whose identities are presently unknown,

Appellees

_____

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 91-cv-03383)

_____

Argued:  August 10, 1994

PRESENT:  HUTCHINSON and NYGAARD, Circuit Judges,
and KATZ, District Judge*

(Filed February 6, 1995)

_____

Robert B. Reed, Esquire                  (Argued)
Donald F. Scholl, Jr. Esquire
Reed & Scholl
31 Highway 12
Flemington, NJ  08822
        Attorneys for Appellant

Michael J. Canning, Esquire              (Argued)
Paul V. Fernicola, Esquire
Giordano, Halleran & Ciesla
125 Half Mile Road
P.O. Box 190
Middletown, NJ  07748
        Attorneys for Appellees

\* Hon. Marvin Katz, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

OPINION OF THE COURT

HUTCHINSON, <u>Circuit Judge</u>.

Appellant, Melissa L. Robertson ("Robertson" or "Beneficiary"), appeals an order of the United States District Court for the District of New Jersey granting summary judgment to appellee, The Central Jersey Bank and Trust Company ("Bank" or "Trustee"). Robertson is the beneficiary of a testamentary trust that names the Bank as trustee. She asserts that the district court erred in holding that a will provision authorizing the Bank to retain its own stock protected it from liability for failure to diversify trust assets when she failed to show that the Trustee acted either "recklessly or in disregard of [its] fiduciary duty of loyalty." <u>Robertson v. The Central Jersey Bank and Trust Company</u>, No. 91-3383, slip op. at 11 (D.N.J. Dec. 9, 1993). Robertson also contends that the district court erred when it held that she could not recover against the Bank for alleged mismanagement of the testator's estate prior to August 12, 1988, the date on which the Superior Court of New Jersey, Law Division, Probate Part ("Probate Court") approved the Bank's account of its administration of the testator's estate.

We hold that the district court erred when it granted the Trustee summary judgment on Robertson's claim that the Trustee violated its fiduciary duty of care by keeping as much as 95% of the trust assets invested in the Trustee's own corporate

stock.  We also believe the district court erred in using recklessness, instead of due diligence, to define the standard of care New Jersey fiduciaries must meet when broadly authorized to retain trust investments.  On the present record, there remain genuine disputed issues of material fact as to whether the Trustee met the standard of care New Jersey requires fiduciaries to exercise to protect trust beneficiaries from investment losses.  We will therefore reverse that part of the district court's order granting the Bank summary judgment on Robertson's claim that it breached its fiduciary duty of care in retaining the investment of almost all of Robertson's trust in its own stock, without any attempt to diversify her trust's investments.

On the preclusion issue, we are in basic agreement with the district court's legal analysis.  We will modify its order, however, to limit preclusion to the period covered by the Bank's account, which ended March 21, 1988, rather than extending it, as the district court did, to August 12, 1988, the date the Probate Court entered its decree approving the Bank's account.[1]

---

[1]  Although the district court relied on issue preclusion to bar Robertson's claim, we believe claim preclusion is the appropriate theory to apply in this case.  See Pittman v. LaFontaine, 756 F. Supp. 834, 841 (D.N.J. 1991) ("Claim preclusion refers to the effect of a judgment in foreclosing litigation of a matter that never has been litigated, because of a determination that it should have been advanced in an earlier [proceeding].") (quotation and citation omitted); Edmundson v. Borough of Kennett Square, 4 F.3d 186, 189 (3d Cir. 1993) ("Claim preclusion . . . is broader in effect [than issue preclusion] and prohibits reexamination not only of matters actually decided in the prior [proceeding], but also those that the parties might have, but did not, assert in that proceeding.").  The precluded claims include the Bank's sale of the "Fair Haven Property" which the Bank included in its accounting as personal representative.

I.

A.

Robertson is the step-granddaughter of Irene Lockwood Robertson ("Testator"). The Testator died on December 25, 1983. In her will, she created a trust in which she gave Robertson one half of any balance remaining in the trust upon the death of Testator's husband. The will was admitted to probate by the Surrogate's Court of Monmouth County on January 23, 1984 and letters were issued to the Bank on the same day.

Article IV of the will gave the Testator's husband, Abraham Robertson (Robertson's grandfather), a life estate that included the marital residence, located at 62 Harvard Road, Fair Haven, New Jersey. Article V placed the Testator's residuary estate in trust for the life of her husband, Abraham, and named the Bank trustee. The Bank accepted this residuary trust on January 26, 1984. Article VI directed the Trustee, upon the death of Testator's husband, to divide the balance of the residuary estate equally between Robertson and the Monmouth County Society for Prevention of Cruelty to Animals. Article VII of the will deferred distribution of Robertson's share of the corpus until she reaches age twenty-five.

(..continued)

Robertson also contends that the district court erred in concluding that the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-2 (West 1989), was inapplicable to the Bank's failure to diversify trust assets. We agree with the district court that a claim for failure to diversify trust assets is not among the fraudulent acts proscribed by the New Jersey Consumer Fraud Act. In addition, we agree with the district court that Robertson failed to show that the Bank breached its duty of loyalty.

The Testator's husband died in 1985. Robertson's trust was separately funded in 1988. At that time, 95% of its corpus was invested in the Bank's own corporate stock. This stock had been held by the Testator at death. Article X of the will gave the Trustee the power to retain any investments.

Article X provides in part:

> [T]he Trustee, . . . in addition to and not by way of limitation of the powers provided by law, shall, except as otherwise provided in this my Will, have the following powers to be exercised in its absolute discretion: To purchase or otherwise acquire and to retain any and all stocks, bonds, notes, or other securities, or any such variety of real or personal property, including interests in common trust funds and securities of or other interests in investment companies or investment trusts, whether or not such investments be of the character permissible for investments by fiduciaries and without regard to the effect of any such investment or reinvestment may have upon the diversification of investments . . . .

Appellant's Appendix at 91-92. It also provides:

> I specifically authorize my corporate fiduciary to retain, temporarily or permanently, any or all of the stock of the corporate fiduciary owned by me at the time of my death in the form in which it then exists.

Id. at 92.

In September 1987, the Bank filed its first account of its administration of Testator's estate. It reported the estate's inventory and appraisements at an initial value of $919,425.19. This included 34,277 shares of the Bank's corporate stock at a book value of $690,957.56. The account showed that

the Fair Haven property was sold for $138,347.03 on February 11, 1986, following the death of the life tenant, Robertson's grandfather. The account also showed that the Bank had sold more than 3,000 shares of its own corporate stock during the period covered, leaving a balance of 31,000 shares. The shares remaining had a book value of $625,812.50, but the market value had increased to almost $1.5 million. The estate's remaining corpus had a total book or inventory value of $775,837.62.

On March 21, 1988, the Bank supplemented its September 1987 accounting and reported the book or inventory value of the Testator's estate at $779,670.03; in the six months or so between September 1987 to March 21, 1988, however, the market value of the Bank's stock had decreased approximately $300,000 to about $1.2 million.

In April 1988, the Bank asked the Probate Court to approve its administration of the estate and its residuary trust to March 21, 1988. The court appointed Kerry E. Higgins, Esq. as guardian ad litem to protect Robertson's interest. In June 1988, Higgins reported to the court that she had met with Robertson's parents, and they "expressed extreme dissatisfaction" with the Trustee's administration of the estate and trust, as well as its failure to communicate adequately with them. Robertson's parents were particularly disturbed by the Bank's sale of the Fair Haven property without notice to them, despite their expressed interest in purchasing it. In addition, they questioned the Bank's sale of some of its own stock. After investigating these matters, however, Higgins reported that, in her opinion, both the Fair

Haven property as well as the Bank's own corporate stock were properly sold for fair value.

On August 12, 1988, the Probate Court entered a judgment approving the Bank's administration of the estate and the trust the will created for the life of the Testator's husband, and discharged the Bank from liability for its conduct from the Testator's death through March 21, 1988. The Probate Court held:

> [The Bank], individually and as personal representative and trustee [of] aforesaid are hereby fully, finally and forever discharged and released of and from any and all liability and accountability with respect to the administration of the Will from the date they commenced serving as such personal representative and trustee, through and including March 21, 1988, the closing date of their First and Final Account and Supplemental Account, and thereafter.

See In re Estate of Robertson, No. 134166, slip op. at 4 (N.J. Super. Ct., Law Div., Probate Part, filed Aug. 12, 1988) (emphasis added).

In or about September 1988, the Bank transferred Robertson's one-half share of the estate's residuary balance into a separate trust for her benefit. Robertson and her parents received an opening statement that showed the Bank's stock passing to Robertson's trust at an opening book value of $309,878.12. These shares again represented more than 95% of the $325,810.98 total book value of Robertson's trust. On September 30, 1988, the market price of the Bank's stock was

$21.00 per share.  Accordingly, it had a market value of $644,700.00 at that time.

In her deposition, Robertson testified that the Bank had begun giving her quarterly financial statements at the end of 1988 and that she had examined them to determine the market value of the stock in her trust and the trust's total value.  Robertson realized that the Bank stock, which was transferred to her trust from the testator's estate, was the trust's main asset.

In January 1991, Robertson wrote to the Bank's trust committee seeking money to purchase a home from her parents near the college she was attending in Florida.  In that letter, Robertson also said that she was "deeply concerned" about the decline in value her trust account had suffered over the preceding year.

On February 8, 1991, the Bank sold 4,000 shares of its stock at $9.22 per share, for a total of $36,875.00, apparently to enable Robertson to purchase the Florida home from her parents.  In July 1991, Robertson again wrote to the Bank complaining about a decline in her quarterly income disbursements from about $7,000.00 to $5,000.00.  She also stated general dissatisfaction with the Bank's administration of her trust.  In the July letter she estimated that her trust's "long slide into the financial cellar" had reduced the value of the corpus of her trust by $500,000.00.

B.

On August 1, 1991, before the Bank responded to her July 1991 letter, Robertson commenced this action.[2] In her complaint she claimed that the Bank had breached its fiduciary duties by permitting her trust account to suffer such a large decline in value, by selling the Fair Haven property below its fair market value and by violating the New Jersey Consumer Fraud Act. After completion of discovery, the Bank moved for summary judgment. The district court granted the Bank's motion on December 9, 1993. It concluded that the will provisions authorizing the Bank to retain assets excused it from all but reckless mismanagement and Robertson had failed to show that the Bank had acted "recklessly or in disregard of its fiduciary duty of loyalty." Robertson, No. 91-3383, slip op. at 12. The district court also concluded that Robertson was precluded from seeking damages for any alleged mismanagement of the trust during the period covered by the Bank's account, including its sale of the Fair Haven property. Finally, the district court held that Robertson had failed to make out a claim under the New Jersey Consumer Fraud Act. Accordingly, it granted summary judgment to the Bank, holding that no material issues of fact remained. Robertson filed a timely notice of appeal on December 29, 1993.

---

[2] In an August 16, 1991 response to Robertson's letter, the Bank primarily attributed the decrease in her income distributions to the liquidation of principal that enabled Robertson to purchase the Florida home. The Bank referred to its express authority to retain the stock the Testator had owned at the time of her death, but stated that it had nevertheless begun to make orderly reductions of the trust's investment in the Bank's own stock and would continue to do so.

II.

The district court had diversity jurisdiction over this case under 28 U.S.C.A. § 1332 (West 1993).  We have appellate jurisdiction over the district court's final order granting summary judgment to the Trustee under 28 U.S.C.A. § 1291 (West 1993).  A district court's order granting summary judgment is subject to plenary review.  Public Interest Research Group of New Jersey Inc. v. Powell Duffryn Terminals, Inc., 913 F.2d 64, 76 (3d Cir. 1990), cert. denied, 489 U.S. 1109 (1991).  Accordingly, "we apply the same test as the district court should have used initially."  Id. (citation omitted).  We evaluate the evidence in the same manner the district court should have, giving Robertson, the non-moving party, the benefit of every favorable inference that can be drawn from the record to determine if there are any remaining genuine issues of material fact that would enable her to prevail.  Fed. R. Civ. P. 56; Bank of Nova Scotia v. Equitable Financial Management, Inc., 882 F.2d 81, 83 (3d Cir. 1989); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

III.

Because the district court exercised diversity jurisdiction over this matter, we are obliged to apply the substantive law of New Jersey, the state in which it sits.  Erie R. Co. v. Tompkins, 304 U.S. 64 (1938); Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487 (1941).  Therefore, we must decide the extent to which a New Jersey trustee's fiduciary

obligations are affected by trust provisions that not only grant them broad discretion in the investment of trust assets, but also broadly authorize retention of any assets the trust receives from the settlor or testator, without regard to diversification.

## A.

The district court concluded that a fiduciary administering a New Jersey trust is governed by the standards set forth in the New Jersey Prudent Investment Law. See N.J. Stat. Ann. § 3B:20-12 et seq. (West 1983) (the "Act" or "Prudent Investment Law."). This statute was first enacted as N.J. Stat. Ann. § 3A:15-18 et seq. (West 1951) and has not been amended in any respect material to this case thereafter. See Fidelity Union Trust Co. v. Price, 93 A.2d 321, 325 (N.J. 1952) ("Unless the trust instrument provides otherwise, it is presumed that the trustor intended that his trustee should have the power to make such investments of the corpus of the trust as the Legislature in its wisdom might from time to time permit.").

Under the Prudent Investment Law, a trustee must act prudently in making or retaining trust investments. N.J. Stat. Ann. § 3B:20-13 (West 1983). Prudence implies a duty to diversify. See Commercial Trust Co. of N.J. v. Barnard, 142 A.2d 865, 871 (N.J. 1958); Restatement (Third) of Trusts § 229(d) (1992). The Prudent Investment Law states:

> In investing and reinvesting money and property of a trust and in acquiring, retaining, selling, exchanging and managing investments, a fiduciary shall exercise care and judgment under the circumstances then

prevailing, which persons of ordinary
prudence and reasonable discretion exercise
in the management of and dealing with the
property and affairs of another, considering
the probable income as well as the probable
safety of capital.  If the fiduciary has
special skills or is named as the fiduciary
on the basis of representations of special
skills or expertise, he is under a duty to
exercise those skills.

N.J. Stat. Ann. § 3B:20-13 (West 1983).

The will creating Robertson's trust has a provision

permitting retention of assets present at the inception of the

trust.  For such a case, the Act provides:

If a trust instrument prescribes,
defines, limits or otherwise regulates a
fiduciary's powers, duties, acts, or
obligations in acquiring, investing,
reinvesting, exchanging, retaining, selling,
valuing or otherwise acting with respect to
the property of the trust estate, the trust
instrument shall control notwithstanding this
article; but nothing herein shall affect the
jurisdiction of the Superior Court to order
or authorize a fiduciary to depart from the
express terms or provisions of a trust
investment for the causes, in the manner, and
to the extent otherwise provided by law.

N.J. Stat. Ann. § 3B:20-15 (West 1983) (emphasis added);[3] see

also Manufacturers Trust Co. v. Earle, 108 A.2d 115, 116 (N.J.

Super. Ct. Ch. Div. 1954) ("Where . . . the decedent has in

effect drafted a Prudent Man Investment Statute of his own and

included it in his will, specifying in what manner and to what

---

[3]  See infra note 6 for discussion of section 3B:20-15's effect
when a trustee's power to retain assets is permissive as opposed
to mandatory.

extent his trustee may deviate from [the Act], the provisions of the will must prevail over the statute."). The Testator's inclusion of a broad discretionary power to retain assets in Robertson's trust, without regard to diversification, brings us squarely up against the question of what limits, if any, New Jersey places upon broad retention provisions like the one in this will.

The Bank contends that the will's authorization to retain its own stock manifests the Testator's intent wholly to abrogate the prudent person standard a New Jersey fiduciary would otherwise owe a trust beneficiary. If so, this will's retention power would completely insulate the Bank from fiduciary liability despite its failure to diversify the trust assets and its continued heavy investment of the trust's resources in its own stock. Robertson, on the other hand, contends that the Bank's disproportionate retention of its own stock is so contrary to the most elementary principles of trust management that it cannot be excused by even the broadest retention power. In support, Robertson relies on an expert witness who concluded that the Bank breached its duty of care, as well as its duty of loyalty, by continuing to invest so large a percentage of the assets of her trust in the Bank's own stock.

At first glance, the provisions of the Prudent Investment Law we have quoted seem to support the Bank's argument. Examination of New Jersey case law applying the Act indicates to us, however, that retention provisions similar to

the one before us do not grant trustees the sweeping exemption from fiduciary duties of care that the Bank proposes.

Generally, if the terms of a trust instrument authorize a trustee to retain investments that originally passed to it from the settlor of a testamentary trust, the trustee may retain them without liability. See Liberty Title & Trust Co. v. Plews, 60 A.2d 630, 641 (N.J. Ch. 1948), rev'd on other grounds, 77 A.2d 219 (1950); N.J. Stat. Ann. § 3B:20-15 (West 1983); Restatement (Third) of Trusts § 229(d) 1992. Nevertheless, a trustee may not rely on a power to retain investments when circumstances make retention imprudent. Plews, 60 A.2d at 648 (quoting Dickerson v. Camden Trust Co., 53 A.2d 225 (N.J. Ch. 1947), modified, 64 A.2d 214 (N.J. 1949)). Stated differently, "[e]ven where securities are retained by a trustee pursuant to . . . a direction in the will, the trustee is privileged to retain them only so long as they remain safe." Id.; see also In re Munger's Estate, 309 A.2d 205, 209 (N.J. 1973) ("The mere fact that the testator did not want his fiduciary bound by [the] statute does not of itself establish that [the testator] desired to authorize [certain investments]."); Restatement (Third) of Trusts § 229(d) (same). In short, an authorization to retain investments enhances the trustee's discretion, but does not wholly insulate it from liability for its exercise of a power to retain assets. Plews, 93 A.2d at 641.

Thus, the first question that must be decided is the standard of care the Bank is required to exercise in managing a trust that permits it to retain its own stock. Viewed from a

different perspective, we might inquire into the extent to which this Testator wished to absolve her trustee of its usual duty to diversify.[4]  In considering these questions, we agree with the district court that New Jersey has rejected the Bank's broad argument that the retention clause completely absolves it from any duty to diversify.  See Plews, 60 A.2d at 641 ("The [retention] clauses adverted to do not of themselves absolve [a fiduciary] from liability. . . .").  It is, therefore, necessary to determine "whether the trustee so conducted itself as to warrant the granting of that protection with which it seeks to cloak itself under the [retention clause]."  Id.

B.

---

[4]  Diversification is a uniformally recognized characteristic of prudent investment and, in the absence of specific authorization to do otherwise, a trustee's lack of diversification would constitute a breach of its fiduciary obligations.  See Restatement (Third) of Trusts § 229(d); See also Erlich v. First Nat. Bank of Princeton, 505 A.2d 220, 236 (N.J. Super. Ct. Law Div. 1984) (An investment manager has an obligation to exercise prudence in diversifying investments to reduce the risk of large losses; indeed, diversification has been the accepted practice since "the early case of Dickinson's Appeal, 152 Mass. 184, 25 N.E. 99 (1890)."); In re Ward Estate, 192 A. 68, 71, 73 (N.J. Prerog. Ct. 1936) ("No ordinarily prudent man would have recommended putting 95 per cent. of the fund in common stocks, certainly not in unlisted securities of a single locality. . . . This portfolio is too lopsided for safety."), aff'd, 191 A. 772 (N.J. E.&A. 1937).  The Bank itself recognizes the importance of diversification.  Its own investment policy provides that excessive concentration of funds in any one issue should be avoided and that if greater than 10% of the equity portfolio is invested in one issue consideration should be given to reducing this concentration by diversifying.

In holding that the asset-retention provision did not "abrogate [the Trustee's] general obligation to invest with prudence," see Robertson, No. 91-3383, slip op. at 11, the district court decided that the asset-retention provisions of Article X of the will were "permissive," as opposed to "mandatory," see id., and that they did not deprive the Bank of power to sell the stock that it now holds for Robertson's benefit.  The district court analyzed the required standard of care as follows:

> [I]f, by the express terms of the trust[,] the trustee is permitted but not required to retain certain investments originally transferred to the trust from the decedent's estate, the trustee is not liable for retaining them absent evidence that said trustee acted recklessly or in disregard of the fiduciary duty of loyalty.

See id. (emphasis added).

We believe that this unduly relaxes the standard of care a trustee owes the beneficiaries.  The prohibition against a fiduciary's retention of its own stock, which the common law once imposed, had as its rationale the fiduciary's duty of loyalty,[5] rather than its duty of care.  Like the district court, we do not think, however, that a permissive power to retain trust assets wholly absolves a trustee from liability for breach of its duty of care; but we disagree with the district court that the standard of care under an explicit power to do so is

---

[5]  We reiterate our conclusion that Robertson has failed to show a breach of the duty of loyalty on this record.  See supra note 1.

recklessness.  Instead we believe a trustee should exercise due diligence in deciding whether to retain its own stock as a trust investment.[6]

Here, however, the district court concluded that the trustee could not be held liable for alleged mismanagement of Robertson's trust, unless she showed that it acted "recklessly." See Robertson, No. 91-3383, slip op. at 11.  We recognize that a fiduciary specifically authorized to retain trust assets may decide to do so even though the value of the retained assets is declining or market indicators otherwise suggest its disposal. Still, a trustee must pay attention.  Its decision to retain the asset must be the result of a prudent, reasoned and deliberate decision-making process.  See In re Paterson Nat'l Bank, 4 A.2d 59 (N.J. Prerog. Ct. 1939), aff'd, 12 A.2d 705 (N.J. E.&A. 1940), discussed infra at 21-23.

_____

[6]  Even a trustee faced with a mandatory retention provision can apply to the court for permission to dispose of any investment it is directed to retain.  See N.J. Stat. Ann. § 3B:20-15 (West 1983); Restatement (Second) of Trusts § 167 (1959); see also Plews, 60 A.2d at 648 (quoting In re Buckelew's Estate, 13 A.2d 855 (N.J. Prerog. Ct. 1940), aff'd, 19 A.2d 779 (N.J. E.&A. 1941)) ("It is the duty of a trustee to use every reasonable effort to inform itself as to the value and the soundness of the trust investments and to keep a careful check of fluctuating values.  If it be in doubt in a situation then it behooves it to seek instructions from the court as to its course of action in the premises.").  In fact, the Restatement concludes that, in emergency situations, the fiduciary may dispose of the security without first obtaining the court's permission, although such action would be subject to the court's subsequent approval.  See Restatement (Second) of Trusts § 167(2) and cmt. e.  We believe a permissive retention provision, like the one in this case, simply allows the fiduciary to avoid the delay and expense evident to court approval.

It is clear that the duty of a trustee to exercise care is affected by a retention provision.  See Price, 93 A.2d at 324.  Neverthless, even one as broad as the one in Robertson's trust does not seem to us to lower the standard to recklessness.  Thus, in Plews, supra, the court analyzed the fiduciary obligations of a trustee that had wide discretion to retain specific assets and held that an asset-retention provision in a trust instrument could not

> be said to relieve the [fiduciary] from exercising that degree of care and prudence normally required of a fiduciary nor to excuse a violation of a trust duty.  [Such authorization] does not permit the [fiduciary] to blindly retain such investments regardless of their value or sufficiency.  'Retaining investments is in effect making them.'  Under these clauses, the same fidelity, faithfulness, care and prudence is required. . . .

60 A.2d at 641 (quotation omitted) (emphasis added).

The Plews court reasoned that asset retention clauses merely "permit the retention of [the] testator's investments for such length of time as [the fiduciary] might deem proper," without regard to any statutory provision.  Id.  They do not absolve a fiduciary from exercising care and diligence in managing trust investments.  Id.  ("Even if [an authorization] clause serve[s] to permit [a] trustee to make [certain investments, otherwise inappropriate] it is still required to exercise that degree of care and prudence in handing [sic] the monies and affairs of the trust estate as is normally required of fiduciaries.") (emphasis added).

The Plews court reasoned further that fiduciaries which possess or hold themselves out to possess expertise in investment management can be more readily found to breach this standard. It stated:

> Normally, a trustee is required to exercise that degree of care and caution, skill, sagacity, and judgment, industry and diligence, circumspection and foresight, that an ordinary discreet and prudent person would employ in like matters of his own.
>
> In the present case, the corporate trustee held itself out as an expert in the handling of estates and trust accounts. It also held itself out as having particular departments for investments and statistical information, and especial skill in this respect. It had so advertised for a number of years, and with the knowledge of the deceased, who had been a director at the time of his death and for many years theretofore. It therefore represented itself as being possessed of greater knowledge and skill than the average man and . . . so it was incumbent upon the trustees to exercise such care, skill, diligence, and caution as a man of ordinary prudence would practice in like matters of his own. . . . And if the trustee possesses greater skill than a man of ordinary prudence, he is under a duty to exercise such skill as he has. It was under a duty to exercise a skill greater than that of an ordinary man. The manner in which investments were handled must be viewed and assayed in the light of such superior skill and ability.

Id. at 642 (quotations and other citations omitted) (emphasis added).[7]

_____

[7] See also N.J. Stat. Ann. § 3B:20-13; In re Estate of Killey, 326 A.2d 372, 375 (Pa. 1974) (citing Plews in rejecting trial court's use of ordinary negligence standard and holding instead that a trustee bank, which "held itself out as an expert in the

Applying these general principles to the facts before it, the Plews court held that the trustee had failed to exercise the degree of care, skill, diligence and fidelity generally required of a person with its skills and that the securities in question "were held beyond the time when they were safe." Id. at 648. The court reached this conclusion even though it decided that there was no proof of wilful wrong, bad faith, fraud or gross misconduct. We believe the Plews court's rejection of a gross misconduct standard forecloses use of the "reckless" standard the district court applied in the present case. Robertson, No. 91-3383, slip op. at 11.

Moreover, in Behrman v. Egan, 95 A.2d 599 (N.J. Super. Ct. Ch. Div. 1953), the court held trustees liable for a trust's losses despite an exculpatory provision insulating them from liability for mismanagement. The court rejected the trustees' argument that the trust agreement "relieve[d] them from all responsibility for actions other than those which were the result of conscious wrongdoing." Id. at 601 (emphasis added). Rather the court held, "the [trustees] contention that the exculpatory clause saves the trustees from any penalty for conduct other than that which would, in effect, constitute an indictable offense, is untenable." Id. It reasoned:

>          While consideration is given to such
>     exculpatory provisions the courts construe

(..continued)
handling of estates and trust accounts[,]" was "under a duty to exercise a skill greater than that of an ordinary man and the manner in which investments were handled must accordingly be evaluated in light of such superior skill.") (footnote and citations omitted).

> them strictly and there appears to be a
> tendency to view such provisions with a
> searching scrutiny of the relation existing
> between the parties and the circumstances of
> the insertion of such a clause in a trust
> instrument.  Our courts have applied a strict
> construction to such exculpatory clauses and
> have said that they do not relieve a trustee
> of liability where a loss results from
> <u>negligence in the administration of the</u>
> <u>trust.</u>  Liberty Title & Trust Co. v. Plews,
> 142 N.J.Eq. 493, 60 A.2d 630 (Ch. 1948).

<u>Id.</u> (emphasis added) (other citations omitted).  The <u>Behrman</u>

court then held that "[t]he conduct of [a] trustee [is] to be

measured by the principle that a trustee owes an obligation to

the Cestuis and a duty to exercise that <u>degree of care, prudence,</u>

<u>circumspection and foresight, that an ordinary prudent person</u>

<u>would employ in like matters of his own</u>." <u>Id.</u> at 601-02 (emphasis

added) (citing, among other cases, <u>Paterson Nat'l Bank</u>, <u>supra</u>).

We think the district court mistakenly relied on

<u>Paterson Nat'l Bank</u>, <u>supra</u>, and <u>Beam v. Paterson Safe Deposit &</u>

<u>Trust Co.</u>, 92 A. 351 (N.J. E.&A. 1914), as authority for a

standard of recklessness.  In <u>Paterson Nat'l Bank</u>, the will not

only authorized and empowered the trustee to retain certain

stock, but also expressly exempted it from liability for any loss

resulting from such retention.  <u>Paterson Nat'l Bank</u>, 4 A.2d at

61.  The court held that the trustees were not liable because

"the trust was discussed and considered at practically every

meeting" and the directors were "always of the opinion that the

said stock should be retained."  <u>Id.</u> at 62.  It so held because

there was no "proof that [the] trustee did not give <u>diligent and</u>

<u>careful consideration</u> to the administration of its trust."  <u>Id.</u>

(emphasis added).  It found instead that the trustee
<u>exercised its best judgment and</u>
<u>circumspection in determining whether to sell</u>
<u>or retain</u> the very stock which the testator
himself had acquired and held as an
investment.  Even if it could then have been
definitely said and determined that it erred
in its judgment, nevertheless that alone
could not render it now liable to being
surcharged.

<u>Id.</u> (emphasis added) (citations omitted).

Thus, although <u>Paterson Nat'l Bank</u> held that the

trustee was not liable, it plainly said that even a trustee who

is expressly absolved from liability for retention has to

exercise due diligence in its exercise of a power to retain

investments.  Specifically, the court stated:
[A] careful examination of the proofs here
adduced fails to disclose any evidence of
<u>negligence</u> on the part of the trustee either
in the administration of the trust or in the
retention of the stock in question.  All that
the law exact[s] of [a] trustee in the
administration of its stewardship [is] an
obligation of faithfulness to the cestuis and
a duty to exercise ordinary care, prudence
and diligence.

<u>Id.</u> at 61 (emphasis added) (citations omitted).

<u>Paterson</u>, therefore, does not relieve a fiduciary with a power to

retain trust assets from its duty to exercise due diligence.  <u>See</u>

<u>Blauvelt v. Citizens Trust Co.</u>, 71 A.2d 184, 188-189 (N.J. 1950)

(citing <u>Paterson Nat'l Bank</u> in framing the issue as "whether the

retention of the stock constituted <u>negligence</u>," as opposed to

recklessness) (emphasis added); <u>Berhman</u>, 95 A.2d at 602 (citing <u>Paterson Nat'l Bank</u> as standing for the same proposition).

Likewise, we do not read <u>Beam</u>, 92 A. 351, to stand for the proposition that the standard of care governing a fiduciary administering a trust with broad retention powers like those we have here is recklessness.  Though the stocks and bonds the <u>Beam</u> trustee retained were, as here, those a testator had invested in during his lifetime, the record in <u>Beam</u> showed that the trustee had acted diligently to protect the beneficiary's interest.  Thus, as in <u>Paterson</u>, the trustee was not held liable for the losses the trust suffered.[8]

_____

[8]  In the present case, during oral argument, the Bank's counsel stated that it decided to retain the stock in the Robertson trust account because it viewed itself as a candidate for takeover.  If supported by evidence, this could provide support for the proposition that the Bank exercised an appropriate degree of care.  Whether this would be sufficient to bring the Bank within the protection the asset-retention clause was intended to provide seems to us, however, to be a question of fact that cannot be decided on a Rule 56 summary judgment motion.  Robertson points to conflicting evidence, such as the Bank's policy on diversification and its conduct in the administration of similar accounts.  Resolution of these conflicts involves questions of fact, not law.

C.

Furthermore, since Paterson and Beam were decided, the New Jersey courts have been increasingly reluctant to excuse mismanagement by professional fiduciaries who hold themselves out to have expertise in trust administration. See Erlich, 505 A.2d at 232 ("The policy of this State, expressed in both case law and statute, dictates that professionals be held to the standards of their professions in delivering services to their clients.").

In Erlich, for example, an investor brought an action against a corporate trustee and its former employee, seeking damages for alleged mismanagement of a custodian management account ("CMA"). There, 80%-90% of the portfolio (based on market value) was invested in the stock of one company. When the value of this company's stock declined substantially the person who had created the account filed a claim against the Bank alleging negligence, malpractice, breach of fiduciary duty and breach of contract.

The Ehrlich beneficiary had significant control over investments and "[n]o stock was ever purchased or sold without [his] written authorization." Id. at 228. In addition, the custodial agreement between the bank and investor had an exculpatory clause relieving the bank from liability not only for investment recommendations it made in good faith, but also for failure to make recommendations. The court held that this exculpatory clause was void and unenforceable, reasoning that to "allow investment advisers to exculpate themselves from the mischief caused by their breach of duty would violate the public

policy of this State." Id. at 233.  Instead, it held the trustee

to the following standard of care:

> A professional must exercise that degree of care, knowledge and skill ordinarily possessed and exercised in similar situations by the average member of the profession practicing in his field. . . .  It is therefore the degree of care, knowledge and skill expected of professional investment advisors to which we must look for the standard of care.

Id. (citations omitted).

The Ehrlich court concluded that "it was not prudent of the Bank

to use a single stock strategy for plaintiff, given his

circumstances," id. at 235, and held the bank "negligent in its

supervision and periodic review of the account, its failure to

provide for diversification and its failure to consider the risks

[of non-diversification] to plaintiff."  Id. at 238.[9]

In In re Estate of Bayles, 261 A.2d 684 (N.J. Super.

Ct. App. Div. 1970), the court similarly held an executor liable

for retaining approximately 60% of a trust's corpus in a stock as

it declined in value.[10]  Because the executor was an attorney who

was experienced in the administration of estates, the court

---

[9]  In this case, there is a similar agreement between the Bank and Testator, separate from her will.  Erlich clearly shows that this agreement cannot insulate the Bank from liability for mismanagement of Robertson's trust.

[10]  Distinguishing the duties of trustees and executors, the Bayles court stated that trustees are usually held to higher standards than personal representatives, but nevertheless held that even "[an executor] may be held liable for loss if he retains stock or other securities beyond a reasonable time for sale."  Bayles, 261 A.2d at 689.

stated that he should have taken prompt steps to liquidate the stock of a single company that represented more than half the value of the estate's investments and was undergoing volatile price changes. The Court held him liable, despite a finding that he did not act recklessly or in bad faith.[11]

D.

We believe these decisions also require us to consider asset-retention powers in conjunction with the Testator's purpose and her objective in creating the trust in light of the trust agreement read as a whole. See Restatement (Third) of Trusts § 229(d) (Retention authorization and other exculpatory language "does not allow the trustee to act in a state of mind not contemplated by the settlor.") (emphasis added); Plews, 60 A.2d at 639-40 (same); In re Munger's Estate, 309 A.2d at 208 (same). This Testator created a trust to postpone distribution of substantial wealth. Its preservation requires skillful and diligent investment until Robertson attains age twenty-five, now two years in the future. We do not believe the Testator intended to authorize the Bank to retain an inordinate percentage of the trust's assets in its own stock without exercising due diligence.

---

[11] See also Hy-Grade Oil Co. v. New Jersey Bank, 350 A.2d 279, 282 (N.J. Super. Ct. App. Div. 1975) ("'We find the public need for professional and competent banking services too great and the legitimate and justifiable reliance upon the integrity and safety of financial institutions too strong to permit a bank to contract away its liability for its failure to provide the service and protections its customers justifiably expect, that is, for its failure to exercise due care and good faith. . . .") (quotation omitted), certif. denied, 361 A.2d 532 (N.J. 1976).

Were we to so hold, we believe we would permit this Trustee to act without regard for the Testator's purpose of protecting Robertson against inept or rash youthful investment.[12]

Based on all these cases, we believe New Jersey holds a Trustee who has a broad discretionary power to retain its own stock, to a due diligence standard, rather than recklessness.[13] Under a due diligence standard, the question whether the Bank's liability for breach of the fiduciary duty of care it owes Robertson cannot be decided in the Bank's favor on the record now before us on a summary judgment motion.[14]

---

[12] It also seems to us that the Testator's intent may be a fact question, which would be inappropriately disposed of on a summary judgment motion. See Shanley & Fisher, P.C. v. Sisselman, 521 A.2d 872, 878 (N.J. Super. Ct. App. Div. 1987) ("[T]he court should be particularly hesitant in granting summary judgment where questions dealing with subjective elements such as intent . . . [is] involved.") (citations omitted).

[13] New Jersey's due diligence standard is not in conflict with the Restatement of Trusts, nor does it seem precluded by the dicta in Paterson Nat'l Bank on which the district court relied when it adopted a standard of recklessness to judge the Bank's continued investment of almost the entire corpus of Robertson's trust in its own stock.

[14] Our conclusion is supported by the decisions of courts in other states. See First Alabama Bank of Huntsville v. Spragins, 475 So. 2d 512, 516 (Ala. 1985) ("We agree with the general proposition that the duties and obligations of the trustee are governed in large measure by the terms of the trust instrument. We do not agree, however, that this proposition can be applied here to lessen the duty imposed by the "prudent person" standard.") (emphasis added) (citations omitted); Union Commerce Bank v. Kusse, 251 N.E.2d 884, 890 (Ohio Prob. 1969) ("[U]nlimited investment authority given to [a trustee in a] will does not relieve the fiduciary from the obligation of due care and prudence. . . . When the fiduciary is a corporate executor and trustee, with greater skill and facilities for handling trust estates than those possessed by the 'ordinary prudent man,' such fiduciary is held to a higher degree of care, consonant with its

## V. Conclusion

We will reverse the district court's order granting the Bank summary judgment. We will modify that part of the district court's order precluding claims for mismanagement on the basis of claim preclusion to bar Robertson's claims up to March 21, 1988, instead of August 12, 1988. Finally, we will affirm the holding of the district court that the Bank did not violate its duty of loyalty and remand this case to the district court for further proceedings consistent with this opinion.

(..continued)
greater skill and facilities.") (citations omitted); Starks v. United States Trust Co. of N.Y., 445 F. Supp. 670, 678 (S.D.N.Y. 1978) ("A trustee's performance is not judged by success or failure . . . and while negligence may result in liability, a mere error in judgment will not.") (emphasis added) (footnotes omitted); Estate of Killey, 326 A.2d 372, 375 (Pa. 1974) (citing Plews, 60 A.2d 630) (rejecting trial court's use of ordinary negligence standard and holding, when a trustee bank "held itself out as an expert in the handling of estates and trust accounts[,] . . . [i]t was . . . under a duty to exercise a skill greater than that of an ordinary man and the manner in which investments were handled must accordingly be evaluated in light of such superior skill.") (footnote and other citations omitted).